WARREN FEATHERBONE CO. v. AMERICAN FEATHERBONE CO. et al.

(Circuit Court, N. D. Illinois, N. D.   November 28, 1904.)

No. 26,56?

**1. PATENTS—INVENTION—FEATHERBONE.**

The Warren & Holden patent, No. 559,827, for an improved process for making featherbone for use in corsets, etc., and the resulting product, marked a distinct advance in the art. It was not anticipated, nor is it void for prior public use; and in view of its utility, as shown by the marked success of the new product in the market, it must be conceded to disclose invention. Also *held* infringed.

In Equity.

Offield, Towle & Linthicum and S. C. Mastick, for complainant.
Lysander Hill, Max Guthman, and Chas. S. Hill, for defendants.

KOHLSAAT, District Judge.   Complainant files this bill to re-strain infringement of patent No. 559,827, for a "corset stiffener and method of making same," granted to E. K. Warren and J. H. Holden May 12, 1896, on an application filed March 5, 1895, of which patent complainant is now the owner. Defendants set up in their answer three defenses: (1) Want of invention; (2) anticipa-tion; (3) public use more than two years prior to the filing of the application.

Edward K. Warren, president of complainant, and one of its grantors in said patent, was the original inventor of featherbone,

a substitute for whalebone in women's apparel, as set out in letters patent No. 286,749, issued to him October 16, 1883, and letters patent No. 311,621, issued to him February 3, 1885. The former pertains to the winding of the strands made from feather quills into cords, and the latter covered the winding of the cords side by side to form a tape or flat blade. The patent in suit purports to provide in claims 1 and 2 for a process for overcoming the defects in the featherbone of the said preceding patents, which were so serious as to make featherbone impractical as an article of commerce, and in claims 3 and 4 for the result of the process as a finished product. It is claimed by complainant that ever since the granting of the said prior patents it was continuously engaged in the effort so to perfect its featherbone as to make the blade smooth, flat, thin, continuous (in part independent of the winding), and, when desired, more strong and elastic. The process of the patent is as follows, viz.: After the blades have been wound and stitched as indicated in said prior patents, they are then passed through a suitable sizing of glue and other constituents, in strips as long as desirable, until thoroughly saturated. They are then passed into a drying device, so heated as to dry the same as thoroughly as they can be heated by such means. They are then passed through a steam-heated pipe, which is itself passed through a larger steam-heated pipe, and so thoroughly heated as to soften the fibres of the quill. The specifications claim that in this manner the quill will be almost melted. When thus heated, the featherbone is passed out of the pipe, while yet hot, between cold rollers, made male and female, to receive the bone, and compressed and formed into the size desired. For this process it is claimed that the sizing causes the thread to adhere to the fibers, and fills up the interstices between the fibers, so that when cooled off and dried the result is a composition that unites very firmly with the fibers, and connects the thread tightly thereto. It is further claimed that in the passage of the blade through the heating tube the heat softens the sizing and the quill, and makes the blade pliable and easy to bend, and so soft that it retains its shape when bent, and that it recovers its elasticity in cooling. It is also claimed that when the heated blade is passed through cold rollers, the pressure crowds the fibers into the blade so as to form a continuous blade in appearance. The temperature used approximates the boiling point. The result is claimed to be a perfected and superior article; one which, while it resembles whalebone in appearance, yet will not split, is resilient, and can be sewed through without injury to the texture.

The success of the substitute for whalebone, it is claimed, began about the last of the year 1893 or the first of the year 1894. From a table of sales in evidence it appears that the sales advanced from 195,144 yards in 1893, when the alleged infringed process and product were not yet perfected, to 403,752 yards in 1894, and reached the enormous figure of 9,942,104 yards in 1902. Complainant alleges this to have been the result of merit. The defendants ascribe it to judicious advertising. It may fairly be said to be the result of both.

The alleged infringing product is practically identical with that of complainant. The process, defendants claim, is different, and is described as follows: The featherbone blade of the prior and expired Warren patent, No. 311,621, is first passed through a hot glue solution. It is then passed between tongued and grooved steel or rubber rollers to remove the surplus sizing. It is then moved back and forth through a steam-heated drying box, and thoroughly dried, and then, without regard to its temperature, passed through hot tongued and grooved steel rollers whereby it is compressed and smoothed.

Considering the defenses in the order named above, it becomes necessary first to inquire whether the record discloses invention. In determining this question it is proper to bear in mind the condition of the trade as well as the art to which the patent in suit is allied. Whalebone, which had for many years been the stay in several senses of manufacturers of women's apparel, was rapidly disappearing from the market by reason of the scarcity of the whale, from which it was obtained. Its scarcity led to the production of numerous devices as substitutes, the numerous patents for which are shown in the record herein. Fragments of whalebone combined with hemp and other materials; scapes of feather spun into fabric; tampico or sisal grass combined with some adhesive substance; strips of whalebone combined with horn or similar substances; horsehair saturated with rubber; and many other materials and combinations are claimed as proper substitutes. In all of these some article of sizing is used, but none of the articles seems to have met with marked success. Even the Warren patents of 1883 and 1885, before referred to, failed to win the market for various reasons. The bone covered by them was rough and clumsy. It was too heavy and brittle. It contrasted to its disadvantage with whalebone used in a manner which called for symmetry, neatness, lightness, resiliency, and style. It would naturally be the subject of caprices and fault-finding. Thus every slight advance was magnified into importance. In such a case the step between an indifferent reception by the public and a hearty adoption of a device may not be distinguishable, but must, in the nature of things, be marked. It may have scarcely other tokens of advance than the winning of popular favor. In that case the favor would be a potent element in determining the invention. It is somewhat difficult to ascertain from the record just what was the last step in perfecting the product of the patent in suit, and to distinguish it distinctly from the prior art. There seem to have been continual efforts to overcome annoying defects. The character and manner of applying the sizing, the methods of applying heat and pressure, find something of similarity in the prior art. But when all is said and done, the difference between the stiffener of the patent in suit and those disclosed in the prior art is the difference between success and failure, and I am therefore constrained to hold that the patent discloses invention.

In the next place, it is urged by defendants that the patent in suit was anticipated in the prior art. I have considered this defense in connection with the foregoing discussion of invention, and disposed of it.

Much stress is laid in the briefs of defendants upon the alleged fact that the invention claimed in the patent in suit had been in prior public use more than two years prior to the filing of the application. The testimony is conflicting. The patentees are not examined. Various other features of the record would seem to leave the mind in doubt as to just what are the facts. From the correspondence introduced, it seems to be certain that complainant and its grantors were constantly engaged in perfecting the stiffener. Considering the fact that Warren was the first inventor of featherbone, that he and his grantors were constantly endeavoring to cure defects in the construction, and the rule of law which requires that every reasonable doubt as to the prior art should be solved in favor of the patent, I have no hesitancy in finding that no such prior use was had in this case as would bar complainant from asserting its rights under the patent.

It remains only to consider the question of infringement. The two products are substantially the same as above stated. The two processes may be compared as follows, viz.:

| Patent in Suit. | Defendants' Device. |
|---|---|
| (1) The wound and stitched blade passed through sizing of glue and other suitable constituents. | (1) The featherbone blade of Patent 311,621 is passed through a hot glue solution. |
| (2) The blade is then passed into a drying device, and dried as thoroughly as can be done in that way. | (2) It is then passed between tongued and grooved steel or rubber rollers to remove surplus sizing. |
| (3) It is then passed through a steam-heated pipe inclosed within a larger steam-heated pipe, and heated to such a degree as to soften the fibers of the quill. | (3) It is then moved backward and forward through a steam-heated drying box, and thoroughly dried, and then reheated by passing it through a bath of hot glue. |
| (4) When thus heated, it is passed out of the pipe, while hot, between cold rollers, made male and female (or tongued and grooved), and compressed and formed into the size and shape desired. | (4) And then, without regard to its temperature, it is passed through hot tongued and grooved rollers, whereby it is compressed and smoothed. |

Thus it will be seen that the only apparent difference between the two processes consists in the use of the heated blade and cold rollers in the last step by complainant, and the use of hot rollers, without regard to the temperature of the blades, by defendants. Is not the use of the hot roller by defendants the equivalent of the hot blade and cold roller of complainant? It is the presence of heat and the result attained by subjecting the blade to pressure that fills the interstices, and makes the blade solid and serviceable. The mere fact that complainant may claim other results which do not follow from defendants' method cannot serve to deprive it of the right to secure to itself the substantial benefits of the patent which defendants have appropriated.

Defendants' reply brief seems to concede all but infringement. Being satisfied that the record shows infringement, the court finds that the prayer of the bill must be granted as to all claims.

Complainant's counsel may prepare a decree in accordance herewith.