## CUNNINGHAM PIANO CO. v. ÆOLIAN CO.

(Circuit Court of Appeals, Third Circuit. January 31, 1919. Rehearing Denied March 26, 1919.)

No. 2418.

PATENTS ⬡328—VALIDITY AND INFRINGEMENT—PIANO PLAYER.

    The Young patent, No. 692,968, for controller for mechanical musical instruments, *held* valid and infringed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania: Oliver B. Dickinson, Judge.

Suit in equity by the Æolian Company against the Cunningham Piano Company. Decree for complainant, and defendant appeals. Affirmed.

For opinion below, see 251 Fed. 301.

Hector T. Fenton, of Philadelphia, Pa., for appellant.

George D. Beattys, of New York City, and Joseph C. Fraley, of Philadelphia, Pa., for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. By the decree of the District Court, claims 1 and 2 of Letters Patent No. 692,968, dated February 11, 1902, issued to complainant as assignee of the inventor, Francis L. Young, for an Improvement· in Controllers for Mechanical Musical Instruments, were held valid and infringed. We affirm the decree on the court's opinion (D. C.) 251 Fed. 301, without doing more than to state very generally the feature of the case which has most impressed us.

The invention of the patent relates to mechanical musical instruments such as the "pianola," and more particularly the "piano player," wherein musical notes are automatically sounded by pneumatic mechanism actuated by a traveling sheet of perforated paper. The state of the art—that is, the point which the art had reached and at which it had stopped just before the patentee entered it—records the advance of a remarkable though imperfect mechanical musical instrument. The organization of this instrument contained, first, means for the mechanical sounding of musical notes, governed in their production and duration by the other mechanical means of a traveling sheet of perforated paper; and second, means for giving artistic effects to the sounds thus mechanically produced, by controlling their speed and volume. The latter means embraced a number of parts termed "controllers." Though connected with the sound producing mechanism, these were operated, not mechanically, but manually by the performer, and were the particular instruments the performer used to control variation in sound volume and time and thereby to give to a musical composition the artistic interpretation he desired. Without controllers, the instrument produced an unmusical jumble of sounds. With controllers, the production was musical according to the skill with which the performer moved the controllers and governed the artistic effects of time and sound. One unskilled in music could render very little real music from the sounds with which the mechanism supplied him. Skill of a musician in some measure was required for the production of music.

Obviously, instruments with a musical range limited to musicians more or less skilled were limited in their sale. To broaden the commercial field, manufacturers found it necessary to qualify the unmusical as musical performers by affording them a modicum of skill that could be easily acquired. With this in view, they printed instructions on the margin of the perforated music sheet so as to convey to the mind of the performer, as the music sheet traveled into view, the musical effects which were appropriate at the moment when later the sheet passed over the point at which its perforations called forth sounds. These instructions consisted of words familiar to ordinary music, such as, "accel," or "ritard," when they related to speed or tempo effects; and "piano," or "forte," when they related to sound volume or dynamic effects. Webber, No. 452,203.

Numerals also were printed in vertical alignment on the margin of the sheet or on the body of the sheet out of alignment. These numerals corresponded to others on a dial placed conveniently within the range of the performer's vision. They indicated the tempo; and as

they moved on the sheet toward the sound actuating board, the performer could obtain the appropriate speed or time by moving a controller-connected pointer to the appropriate numeral on the face of the tempo indicator. Chase, No. 571,746; 638,955; Richards, No. 653,529.

In addition to these instructions there were others, the most useful perhaps being a line printed lengthwise the traveling sheet but shifting across its face, from side to side, technically known as the "expression line." This line—the invention of Webber, Letters Patent No. 452,203—was not truly sinuous in the sense of bending in and out in a wavelike course, but shifted its direction abruptly and at angles. In its position and change of direction, this line denoted generally but not precisely the appropriate sound volume and its changes, and when followed by the eye, it carried to the mind of the performer some measure of the artistic interpretation as to loud and soft sounds and as to changes from one to the other which the musical composition called for. The Webber line was an interpretative guide. Whatever its merits, it was only a guide. The musical interpretation it conveyed to the performer was capable of reproduction by him only according to his skill in following the line with his eye and mind —in reading what the line imparted—and in manipulating the controllers in a way to produce the effects the line intended.

It thus appears very clearly that the art, when Young entered it, called for some musical knowledge and some musical skill on the part of the performer to render artistically a musical composition mechanically sounded. It is equally clear that the art enabled him to render music only according to his own skill, or, at most, only according to his skill in reproducing the interpretation of another so far as that interpretation was shown by words, numerals and by the Webber expression line and its angles.

The conception of Young, the patentee, also contains a line, but a line different in character and function. In the line of the invention, nothing is left to the skill or interpretation of the performer in supplying musical effects when the line changes its position and direction. The performer does not have to read it. The purpose of the invention, therefore, is to facilitate, continuously and without breaks, the rendering or "shading" of music whose notes are mechanically sounded, so that a person who has *no* musical knowledge and who is *without* artistic skill in any degree can reproduce a musical composition of high order, not with tolerable fidelity, but exactly as the skilled pianist had played it and interpreted it.

What Young did was to extend the tempo controller mechanism over the traveling sheet and fasten a pencil to it. When he played the piano, the sheet moved against the pencil, which drew a line lengthwise the sheet and throughout the musical composition. This line varied in direction with each variation of musical effect given by the performer. The changes of direction were not sudden, abrupt, or angular, as in Webber, but were bending and sinuous, and it was found that in the sinuosities of the line were exactly recorded every variation of tempo expression. What Young achieved was to im-

press upon a musical composition, and upon every note of it, his interpretation and his artistic conception of its musical effects and to embody them in the line thus drawn. These recorded effects may be either of time or sound volume according as the controller mechanism is adapted to one or the other. What Young gave the art was an idea made practical by mechanical means, whereby the interpretation of a master performer, or even of the composer, can be exactly reproduced with its precise artistic effects by an unskilled performer merely following the line impressed upon the sheet, not by his eye or by his mind, but physically by a pointer attached to the controller mechanism and extending over the music sheet. Young's line became the expression pathway of the master performer, and so long as one follows it without wandering, he will reproduce the master's actual performance. The skill of a great artist can thus be caught on the sheet, there impressed and preserved and be reproduced by anyone, anywhere, and for all time.

The defendant says that invention was not involved in this. We think it was. In the first place, it was a true discovery. It involved uncovering a thing, which, while long capable of being done, was never before thought of. It also afforded a medium or means for bringing the discovery into practical action, and put it into the hands of others, there to be turned to pleasurable and profitable uses. Young's thought that a line might be made to record a master's interpretation of a musical composition, and that anyone, however unskilled, who follows that line physically can reproduce the music of the master just as the master had rendered it, was not his invention. That was his discovery. It was, however, the soul of his invention. The very simple means of a pointer connected with the controller and extending over the music sheet to the line, by which his discovery was brought into action, did not, when standing alone, involve invention. But when this means, simple though it was, was employed to bring into being and put to use the substance of the discovery, the two together, the great and the little thing, constitute invention. Young's thought without the pointer is nothing more than an interesting discovery, and is not patentable. Morton v. New York Eye Infirmary, 5 Blatchf. 116, Fed. Cas. No. 9,865; Miami Copper Co. v. Minerals Separation, Limited, 244 Fed. 752, 157 C. C. A. 200. The pointer without the thought is a useless piece of metal. The world may use one without the other at will; but it is the use of both together that Young taught the art, and of which the unskilled who are anxious to produce music, as well as the skilled who are ambitious to perpetuate their fame, have availed themselves in amazing numbers.

We realize that the issues of validity and scope of the claims in suit, and consequently the issue of infringement, present aspects which admit of extended technical discussion; but as our reasoning follows that of the learned trial judge as shown in his opinion, and as our judgment on all issues is the same as his, we find it unnecessary to do anything more than direct that

The decree below be affirmed.