## KURTZ et al. v. BELLE HAT LINING CO., Inc.

(Circuit Court of Appeals, Second Circuit. April 10, 1922.)

No. 273.

1. **Patents ⬤36—Invention is question of fact, to be decided on evidence.**

   Invention is a question of fact, to be decided on the evidence, which generally does not give rise to conflicts of fact in the ordinary sense of that phrase, but does raise differences as to the inferences to be drawn from facts in themselves uncontradicted.

2. **Patents ⬤35—Condition of trade to be considered in determining invention.**

   In determining whether there is invention, it is proper to bear in mind the condition of the trade, as well as the art to which the patent is allied.

3. **Patents ⬤35—Decision as to invention is governed largely by results obtained.**

   Decision as to invention is reached very largely from examination of the results obtained, among the results evidencing invention being simplicity, economy, novelty, utility, and commercial success; and imitation of an article by a defendant, who denies invention, has often been considered conclusive evidence of what defendant thinks, and persuasive of what the rest of the world ought to think.

4. **Patents ⬤328—1,216,140, for hat lining, held to disclose invention.**

   The Kurtz patent, No. 1,216,140, for a hat lining, in which an uncovered cord is sewed between the crown piece and side piece to produce an ornate seam, held, in view of its commercial success, to disclose invention over the prior art.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity for infringement of a patent by Alfred Kurtz and another against the Belle Hat Lining Company, Inc. Bill dismissed, and plaintiffs appeal. Reversed.

Action is upon patent to Kurtz, 1,216,140, dated February 13, 1917, for "lining for hats." The patent contains two claims, both in suit, of which the second is most specific and is as follows:

"A hat lining comprising a crown piece, a side piece, an uncovered cord exposed between said crown piece and side piece, and means for securing said crown piece, side piece and cord together for forming an ornate seam between said crown piece and side piece; said means embodying a single row of stitching passing through said crown piece, side piece, and cord."

On July 25, 1916, there issued to one Rawak patent 1,191,996, for "lining for hats," of which the single claim is: "A hat lining comprising a crown member, an apron member, a folded strip having its meeting edges secured between the meeting edges of the crown and apron members, and forming an annular pocket projecting from the juncture of said crown and apron members, and a core inclosed within said annular pocket."

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Kurtz v. Blatt (D. C.) 263 Fed. 392, this Kurtz patent was in suit against another alleged infringer. Decision was that patentable invention was displayed by Kurtz over Rawak, there being in the opinion of Mayer, J., "no prior art worthy of comment except the" lining patented by Rawak. In the present litigation Knox, J., in the court below, held that Kurtz displayed nothing patentable over Rawak, and dismissed the bill for lack of invention. Whereupon Kurtz appealed.

Oscar W. Jeffery, Philip C. Peck, and Tobias A. Keppler, all of New York City, for appellants.

Irving M. Obrieght, Morris Hirsch, and George C. Dean, all of New York City, for appellee.

Before HOUGH and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The record in the cause reported in 263 Fed. 392, is an exhibit in this case. We have examined it, and are of opinion that, though the cause at bar was tried with more elaboration and at greater length, there is no substantial difference between the two proceedings. In both, defendants wasted much time in fruitlessly endeavoring to show prior uses; but in this case Mr. Rawak himself appeared as the principal witness for the defence. His evidence accentuates the truth stated by Judge Mayer at the earlier trial—that there was no prior art except Rawak. Yet the question presented by this patent, and also by that of Rawak, and by the litigation over them, is a larger one, viz. whether, in the crowded art of manufacturing clothing and parts of clothing with the needle and needle appliances, either Rawak or Kurtz displayed what it is so easy to name and so difficult to ascertain, invention.

Hat linings, especially for the head coverings of women, are and long have been a separate article of manufacture and commerce. They are made literally by the million, and sold both to hat manufacturers, milliners, and persons intending to make their own headgear. Historically the occupation, as a separate art or trade, begins with a lining something like a bag without a bottom; whereof one edge is fitted to the lower portion of the hat and the top gathered with a "drawstring" in the crown. This kind of lining required more material than would fit snugly to the interior of the headgear, and was thought to lack, not only economy, but neatness of appearance. A "piping" or "edging" is a very old device of the needle trades, and consists essentially in the insertion of a piece of material between the two parts of a seam, in such manner that the inserted material projects at and along the seam, producing (as has been thought) decorative effect as well as strength.

Rawak's patented device exhibits a piping at the seam between the crown and apron or side, which together make up the hat lining of commerce. His piping, being formed by a "folded strip," may and does have inserted into its projecting "annular pocket" any convenient material; e. g., a cord or other stuffing. It is, we think, proven that this device has attained a large measure of success, principally through the efforts of Mr. Rawak himself; he being a very large manufacturer of hats. It is also proved as requiring more material and costing more than other linings. It is in short a rather superior article, grade for grade, of material, and is probably a favorite in the comparatively ex-

pensive lines of ready-made hats. What Kurtz did was to wholly abolish the inserted material which makes Rawak's "annular pocket," and to take the cord (which may be used as a stuffing for Rawak's pocket) and by one line of sewing unite crown, apron, and cord in such manner as to show the cord and form what he calls an "ornate seam."

Any cord that will hold the thread will do, and if the cord used by either Kurtz or Rawak is stiff enough, both or either will tend to strengthen the lining in position and hold it in place. Kurtz's lining has attained great popularity, doubtless assisted by quite modern trade methods; but the proof is ample of enormous production, marked commercial success, and almost complete replacement in the cheaper grades of linings of the old drawstring device in favor of Kurtz.

This patentee obtained his patent over Rawak (cited against him of record) by a very frank statement in the Office, which had objected that no mechanical advantage was pointed out. Kurtz replied:

"It is thought that mechanical advantage, where the filling member is an ornament. and permanently and structurally incorporated in the article, is obvious as compared to the [alleged] anticipating structure [Rawak's], where the ornamental member is covered, and is not permanently or intimately incorporated in the resulting structure."

Thus is presented the question of invention, admittedly one of fact, yet also one as to which courts, composed of lawyers, have long been anxious to act with uniformity and along lines of thought which will result in precedents, instead of mere incidents. Despite the warning of Justice Brown in McClain v. Ortmayer, 141 U. S. 419, 427, 12 Sup. Ct. 76, 35 L. Ed. 800, that the word "invention" "cannot be defined in such manner as to afford any substantial aid in determining whether a particular device involved an exercise of the inventive faculty or not," the effort still continues. Prof. Robinson analyzed all of these attempts down to his date of publication (1890), which was but a few months before Brown, J., pronounced the effort futile. Rob. Pat. vol. 1, p. 116 et seq. Yet there remains as always worthy of consideration the learned author's dictum that "the mental faculties involved in the inventive act are the creative and not the imitative." Section 78. In comparatively late years efforts at positive statement have been limited to such generalizations as that—

"Invention, in the nature of improvements, is the double mental act of discerning, in existing machines or processes or articles. some deficiency, and pointing out the means of overcoming it." General Electric v. Sangamo, 174 Fed. 246, 251, 98 C. C. A. 154, 159.

What may be called negative definitions or partial descriptions are still and always have been very common. Thus:

"Every result obtained by deliberate reflection and experimentation with well known appliances, or parts thereof, is not necessarily invention within the * * * patent laws." Lord v. Payne (C. C.) 190 Fed. 172.

"Invention involves conception of at least some function, as well as the selection of the means whereby that function can be operatively secured." U. S. Co. v. Hewitt, 236 Fed. 739, 150 C. C. A. 71.

If * * * the mind advances from the known to the unknown by a transition natural to the ordinary instructed intellect, there is no invention." Farnham v. U. S., 47 Ct. Cl. 207.

Again a certain device was invention because—

"It was a true discovery. It involved uncovering a thing which, while long capable of being done, was never before thought of. It also afforded a medium or means for bringing the discovery into practical action, and put it into the hands of others, there to be turned to pleasurable and profitable uses." Cunningham v. Æolian, 255 Fed. 897, 900, 167 C. C. A. 217, 220.

The enormous multiplication of improvement patents has produced such sayings as:

"It often requires as acute a perception of the relation between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo. And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of before." Potts v. Creager, 155 U. S. 597, 608, 15 Sup. Ct. 194, 198 (39 L. Ed. 275).

It has even been thought necessary of late to dwell upon the presumptions; thus a given device—

"certainly [was] not in an exact repetition of the prior art. It attained an end not attained by anything in the prior art. * * * It possesses such amount of change from the prior art as to have received the approval of the Patent Office, and is entitled to the presumption of invention which attaches to a patent. Its simplicity should not blind us as to its character; * * * knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing * * * was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration." Diamond, etc., Co. v. Consolidated, 220 U. S. 428, 434, 31 Sup. Ct. 444, 447 (55 L. Ed. 527).

[1] The foregoing quotations, which might be multiplied, only prove the truth of Justice Brown's dictum, and enforce the other truth which we attempted to point out in Kimball v. Noesting (C. C. A.) 262 Fed. 148, viz. that invention is a question to be decided on the evidence. The problem is the more difficult because evidence as to invention does not often give rise to conflicts of fact in the ordinary sense of that phrase; it does, however, give rise to acute differences of opinion as to the inferences to be drawn from facts in themselves uncontradicted; and this is as true of what is called "opinion evidence" as it is of testimony regarding things visible or tangible. It is probably for this reason that experience has dictated some canons of decision (they are not rules of law) as to how the problem of invention is to be approached.

[2] Thus it has been well said that "in determining this question it is proper to bear in mind the condition of the trade as well as the art to which the patent in suit is allied." Warren, etc., Co. v. American, etc., Co. (C. C.) 133 Fed. 304, 306. And similarly that the "effort [of the court] must always be to view the subject matter from the standpoint of the art concerned." Kurtz v. Blatt (D. C.) 263 Fed. 392, 394. It is also the duty of the court to construe patents liberally, so as to effect their real intent. Bossert v. Pratt, 179 Fed. 385, 387,

103 C. C. A. 45. And cf. Auto Vacuum Co v. Sexton, 239 Fed. 898, 153 C. C. A. 26.

Yet, when all has been done, the question of invention may "be answered differently by persons of equal intelligence." Bossert v. Pratt, supra, 179 Fed. 386, 103 C. C. A. 46. We think, also, courts have always endeavored to observe at least some of Prof. Robinson's guiding rules (supra), as that the nature of an invention is usually ascertained from examining the inventive act from which patented matter results; for invention always generates a new idea, although a patentee must create the means, and not merely perceive the end.

[3] Result is that study of well-considered decisions under this head will always show that result is reached very largely from examination of "the results obtained." Doble v. Pelton, etc., Co. (C. C.) 186 Fed. 526. Results are described by abstract nouns, like "simplicity," "economy," etc., and, while it is always admitted and stated that the mere attainment of such desirable results is not invention, they always have been and must be used as evidence or indicia of invention, and the weight and probative effect of such marks of excellence have varied, and always must vary within limits according to the personal equation of the fact trier.

Thus, while neither simplicity, cheapness, nor utility—nor all three combined—constitute invention, they have been deemed most potent evidence thereof. Barry v. Harpoon Co., 209 Fed. 207, 126 C. C. A. 301. Simplifying form and cheapening cost have been accorded the same potency (Hunt v. Milwaukee, etc., Co., 148 Fed. 220, 78 C. C. A. 116), although, of course, such excellence must always be accompanied by a "different result" (Bernz v. Schaefer [D. C.] 205 Fed. 49, 52). Indeed, it has been thought that simplicity alone, though "cited as evidence of lack of invention, to our minds shows a high order of novelty and invention" (Consolidated, etc., Co. v. Window Glass Co. [C. C. A.] 261 Fed. 362, 375), and to the same point Hills v. Hamilton Co. (D. C.) 248 Fed. 499.

Utility, though itself not invention, nor conclusive evidence thereof, has been practically accorded the greatest weight. Union, etc., Co. v. Peters, 125 Fed. 601, 60 C. C. A. 337; Woerheide v. Johns-Manville, 220 Fed. 674, 136 C. C. A. 316. Cf. Greenwald v. La Vogue, 226 Fed. 448, 141 C. C. A. 278. Novelty, likewise, has been pushed to the front as a piece of evidence. Concrete, etc., Co. v. Meinken (C. C. A.) 262 Fed. 958, 965.

The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think. David v. Harris, 206 Fed. 902, 904, 124 C. C. A. 477; Smith v. Peck (C. C. A.) 262 Fed. 415, 417. Commercial success has been too recently and too often considered to justify much citation; but, however unsafe as a guide (Boston, etc., Co. v. Automatic [C. C. A.] 276 Fed. 910), it has always been a powerful piece of evidence, especially when the prior art shows no success along the same lines (David v. Harris, supra).

The list of laudatory epithets descriptive of what is considered evi-

dence is by no means exhausted; the "marked superiority of the article" constructed under the patent (Frost v. Cohn, 119 Fed. 505, 56 C. C. A. 185); "a marked improvement in product" (Greenwald v. Enochs, 183 Fed. 583, 106 C. C. A. 351); the "ingenuity and popularity" of the patentee's product (Fligel v. Sears, 254 Fed. 698, 166 C. C. A. 196); the "unchallenged supremacy" of the same (Consolidated, etc., Co. v. Firestone, etc., Co., 151 Fed. 237, 80 C. C. A. 589); and even the aid given by the patented article in "advertising and identifying" an entirely different product (Fonseca v. Suarez, 232 Fed. 155, 156, 146 C. C. A. 347—have all been used, and we think properly so, as evidence of invention. ·

Patentability has often been found "in discovering what is the difficulty with an existing structure" and correcting the same, even though "the means" are old and their mere "adaptation to the new purposes involves no patentable novelty." Miehle, etc., Co. v. Whitlock, 223 Fed. 647, 650, 139 C. C. A. 201. Hindsight, or wisdom after the fact, has always been looked upon with disfavor; e. g., Faries Co. v. Brown, 121 Fed. 547, 550, 57 C. C. A. 609.

[4] If we viewed this hat lining, or any hat lining, in the light of our own experience, it would appear trivial and unworthy the dignity of patent protection; but, looking at it through the evidence and (we hope) with the eyes of the hat lining trade, this patent represents a · large and successful business. It is in the minds of all those who deal in hat linings, of the utmost importance. No one ever made a lining of such simplicity, cheapness, and general adaptability as has Kurtz, and he has done it by mechanical means of winning simplicity, to all of which defendant has testified by deliberately imitating Kurtz's product and engaging in expensive litigation to defend the imitation.

We are of opinion upon this record that Kurtz's hat lining is novel, useful, and displays patentable invention.

Decree reversed, with costs.