### SANDUSKY et al. v. BROOKLYN BOX TOE CO. et al.

(District Court, E. D. New York.    June 5, 1925.)

1. Patents ⟨⟩17.

That invention is small and simple, requiring no high degree of imagination, does not negative patentability, where distinct advance in art is achieved.

2. Patents ⟨⟩112(3).

Doubt as to disclosure of patent should be given to patentee, in view of fact that patent had been duly granted.

3. Patents ⟨⟩328.

Patent No. 1,384,858, for improvement in shoe shanks, held valid and infringed.

4. Patents ⟨⟩328.

Winchell patent, No. 1,447,001, for improved shoe shank, held valid and infringed.

In Equity. Patent infringement suit by Morris M. and Joseph Sandusky and others against the Brooklyn Box Toe Company and others. Decree for plaintiffs.

Redding, Greeley, O'Shea & Campbell, of New York City, for plaintiffs.

Hauff & Warland, of New York City, for defendants.

INCH, District Judge. This is a patent suit. The plaintiffs Morris M. and Joseph Sandusky are residents of the state of New York, and claim to be joint inventors of certain new and useful improvements in shoe shanks, for which on February 9, 1921, they duly filed an application for letters patent, and received on July 19, 1921, letters patent No. 1,384,858. The plaintiffs Shavenell and Josephson are trustees of letters patent of the so-called Winchell patent, United States No. 1,447,001, dated February 27, 1923, also involved in this decision. The plaintiff the Sandow Tool Company, Inc., is the possessor of the license under both of the aforesaid patents.

The defendants Brooklyn Box Toe Company and Indestructible Shoe Shank Company are corporations, organized under the state of New York, and are claimed by plaintiffs to have infringed the above patents, and the defendant Robert Davis is an individual, who is also said to have infringed. The answer of the defendants sets forth the usual denials, and invalidity of plaintiffs' patents by reason of anticipation, prior art, etc., lack of title in the trustees, and on the trial it was claimed that the defendant Robert Davis was the actual inventor of the article covered by the patent issued to Morris and Joseph Sandusky.

Thus there were really three issues raised for decision, which may be stated as follows: Whether or not the metal shoe shank, admittedly made and sold by defendants, infringes either or both of plaintiffs' patents; second, whether or not these patents of the Sanduskys and Winchell are invalid by reason of the prior art; and, third, whether or not this Robert Davis invented the article disclosed in the Sandusky patent. No serious contention seems to have been made about title of the trustees above mentioned, but, in order to eliminate this question, I find that good title existed.

It is also unnecessary for me to state in detail the evidence on the question of whether Robert Davis invented, or not, the Sandusky article. Mr. Davis was a witness, and was examined and cross-examined, as well as were the Sanduskys. I have thus had the opportunity to observe their demeanor and their credibility, and I am convinced, so far as this issue goes, that the Sanduskys, and not Mr. Davis, were the true inventors, and that they, and not he, should have the advantage of the limited monopoly resulting from such patent provided same is valid.

This brings us, therefore, to what I consider the real issue, whether or not, in view of the prior art, the patents of Sandusky and

Winchell are valid, for the reason that, if they are valid, either or both, the defendants have plainly infringed, as the articles made or sold by them have been produced, and, so far as the question of invention goes, are almost identical with those made or sold by the plaintiffs. To be sure, Mr. Davis produces an article with certain ridges along its back, indicating, as he says, greater flexibility, and has received a patent on such disclosure; but, aside from this, the rest of his article must stand or fall in accordance with the validity of the plaintiffs' patents, either or both.

It may be well to describe briefly the two patents, and we will take them up in the order that I have above referred to them. The two Sanduskys, as I have said, were granted letters patent by the Patent Office on July 19, 1921, on an application previously made in February. This patent covers a shoe shank having a particular construction of clinching teeth; the novelty claimed was that, in the peculiar construction discovered by the Sanduskys, these teeth, when driven into the leather, would clinch together, and thus adequately hold the shoe shank in its position.

It is astonishing to learn the demand in the trade for shoe shanks. It is of prime importance that these shoe shanks meet the apparently new style of ladies' shoes, with their narrower width and lighter construction, and yet the shank, while durable and performing its function, must not slip, or "ride" underneath, else the shoe is rendered unsatisfactory.

There are, as plainly appears, a great many efforts to meet this demand, and various patents have been introduced, showing the efforts of inventors to discover, not only an ideal shoe shank in form, but in method of application. The mere idea of "teeth" was not new as a method affixing the shank. It was old, in this, as well as in the analogous, art, but the Sanduskys claim that their invention was in the ingenious discovery that, by twisting these teeth around, at an oblique angle to each other, the bevel was gotten on the outside, instead of on the inner side; the important difference of this being that, with this bevel on the outer side, the shank would surely lie accurately, along the middle line of the arch, of the shoe, and would not slip or slide over to one side or the other, which would make the finished shoe unsymmetrical in appearance or of no use.

In other words, the Sanduskys discovered, for the first time, so far as the Patent Office is concerned, that the teeth of an article like this shank, when driven into the leather, where the teeth were merely bent over, without being twisted around obliquely to each other, would produce the bevel face on the inner side of the teeth, and would neither clinch nor hold the shank in position, as would be the case when the teeth had the bevel on the outer side, produced by their being bent over and twisted around, at an oblique angle to each other.

[1] I agree with counsel for plaintiffs, where he states in his brief a quotation from Judge Learned Hand in the case of George Lane v. Craftsmen, 7 F.(2d) 288, decided June 26, 1924, that the words there written are very apt in considering this Sandusky patent, and I know of no better way of stating them than by quoting: "This is a small invention, not requiring any high degree of imagination. I uphold it, not because it took any technical skill to work it out when it had been conceived; perhaps it arose from a mere elimination of use and discard of the different possible alternatives; perhaps it was bound in the end to come, but it had not come after a good many years. The art, for one reason or another, was still working along with more awkward and expensive processes. Unless I am mistaken, the first experimenter who happens on such a process is entitled to keep it as his own. I can see no more reason why others should not be kept within the limits of their own ingenuity while the patent lasts."

Applying this language to the slight, but important, discovery of the Sanduskys, we find all the earmarks of a perhaps small, but important, step in advance, in the art. There at once arose a considerable demand for this kind of shank, and an important business is being built up upon it. Mr. Davis himself asked for and received an agency to sell them, and yet prior to that time this same Mr. Davis had come to the Sanduskys with an old-fashioned shoe shank, the sale of which, in the then market, apparently was not difficult, and it may be well to refer briefly to the testimony, so that the present success of this Sandusky-Winchell shank may be seen in the light of the commercial market, before its introduction.

Mr. Joseph Sandusky testified, and I believe him, that about July, 1919, Mr. Davis came to their factory, they being manufacturers of brass and steel products, such as tools, squares, steel rules, nail sets, etc., and showed the witness a flat spring steel with a little hole on each end of it, and wanted to know if the Sanduskys could manufacture such an article. Sandusky said that they could, and asked how many did he want. Da-

vis said, "Oh! there are millions to be used." Sandusky said, "Are you sure of that?" Davis said, "Positively, that is one of the greatest things in the shoe business."

Davis then showed how these shanks were tacked, by tacks that went through the end holes and were clinched on the other side, and the discussion as to the cost, etc., took place. At a subsequent interview, while the price was still being discussed, Sandusky stated to Davis that the idea of a "man sitting at a bench, grabbing a handful of tacks, or a mouthful, sticking them in the hole, holding it on a plate, picking up a hammer, and hitting it to clinch it, was a great way of manufacturing." Mr. Davis replied, "They are satisfied, and are doing it for years."

Then follows evidence of a series of what can be termed by no less a name than experiment by the Sanduskys, and the then familiar mere bending over of the teeth, to take the place of the tacks. This was tried and abandoned. Finally the method of turning the teeth obliquely to each other, so as to get the bevel on the outer side, was discovered, and the problem was solved. It is this shank, which we will term the Sandusky-Winchell shank, that then became an immediate and sought-for commodity.

It may be well, therefore, to pause and ask, as in the case before Judge Hand, above mentioned, Was this not invention? It is more than simply bending over the teeth. That had been tried and abandoned. Mr. Davis apparently thought so well of this new idea of the Sanduskys that he claims he invented it. All the evidence indicates to the contrary, but that this slight, yet true, invention is a fact, and belongs to the Sanduskys, I am convinced. I am also persuaded to this view, in a case of this character, by the fact that the United States Patent Office has duly granted to the Sanduskys a patent covering this invention, and this should not be lightly set aside.

It does not seem necessary for me to go into the prior art as to the question of the method of affixing metal to leather by means of teeth, of which there are many samples. Suffice it to say that it does not seem to me that this new idea of the Sanduskys was anticipated to such an extent as to render invalid the granting of the patent by the patent office.

We now come to the other patent involved. The Winchell patent. As I have stated, at the beginning, certain of the plaintiffs are trustees of this Winchell patent. On February 11, 1920, about one year before the Sanduskys filed their application, and therefore antedating it, one Freeman J. Winchell claimed to have discovered a certain new and useful improvement in "shank reenforces." This relates to the shank itself. The Sandusky patent, so far as this discussion goes, relates to the manner in which the shank is attached to the leather.

On February 11, 1920, Winchell filed his application in the United States Patent Office, and on November 25, 1922, by due instruments, duly recorded, Winchell transferred all his right, title, interest therein to Winchell, Shavenell, and Josephson, trustees. A few months thereafter, and on February 27, 1923, the United States Patent Office duly issued to said trustees letters patent No. 1,447,001, based on said application, which had been filed about three years before. It will be noticed, therefore, that between the filing of the application by Winchell, and the issuance of the patent thereon, that the Sanduskys had filed their application for the patent already mentioned.

This conflict was thoroughly fought out in the Patent Office, in which it is fair to assume all the prior art, for and against, was marshaled by both sides, so that it is also plain that the Patent Office was compelled to give a most thorough consideration to the very question now here raised, in regard to their validity. The result was that the Sanduskys finally conceded priority to Winchell, and the letters patent were thereupon duly issued to Winchell and his cotrustees, and thereupon a license was issued to operate under such patent to Sandusky and the Sandow Tool Company, Inc.

This Winchell patent, as I have said, relates to the shoe shank. The novelty or invention of Winchell consisted of a strip of struck-up metal, much narrower than any previous devices of this character, and thus, in view of the new style of ladies' shoes already mentioned, produced a shank, accommodating itself in an excellent fashion to such new style, as well as making it much easier for the shoemaker to use his machinery in forming the shoe. It also had, running from a spot near one end to a spot near the other end, a groove which was struck up in it. By this groove, not only was the necessary strength given to the shank, but by it the shoemaker could produce the rounded effect, in the leather over it, that was then, and still is, much sought for, in the present style of ladies' shoes. As has been said, the extreme end of this Winchell shank was flat,

SANDUSKY v. BROOKLYN BOX TOE CO. 241
13 F.(2d) 238

and this flat end had simply a pair of clinching teeth.

It will thus be seen that the Winchell patent and the Sandusky patent could together make a new shoe shank of important desirability, for, while Winchell discovered the shank, to keep pace with the new demand of the shoe trade, his clinching teeth, as would seem to appear from the exhibit and from the testimony, were not equal to the Sandusky method, of having the bevel on the outer surface, as has already been fully gone into. It goes without saying that a shank must be securely anchored, to be of service.

Defendant infringing devices are practically the same as this Winchell-Sandusky shank; the cross-ridges introduced by defendant to make the shank more flexible, while possibly susceptible, so far as this alleged improvement is concerned, of being patented, being insufficient, it seems to me, to prevent plain infringement of plaintiffs' patents. To merely take a plaintiffs' shank, and make it a bit more springy, does not change its essential identity.

Defendant's various devices are marked in evidence as Exhibits 5, 6, and 7. Here again, aside from the evidence in this case, which in my opinion confirms the validity of the Winchell patent, it is persuasive that the United States Patent Office, after most thorough investigation, duly granted to Winchell a patent. The mere fact that defendant's exhibits seem to be fairly good imitations of plaintiffs' article indicates some usefulness in the latter and novelty as well.

"The imitation of a thing patented by defendant, who denies invention, has often been regarded, perhaps, especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think." Judge Hough, in the case of Kurtz v. Belle Hat Co. (C. C. A.) 280 F. 277, 281. Also Judge Mayer, in the case of General Electric Co. v. Mallory (D. C.) 294 F. 562, 564. Also Judge Coxe in the case of David v. Harris 206 F. 902, 903, 124 C. C. A. 477, 478:

"The fact that the defendant is making his sweaters under a subsequent patent to Rautenberg makes the defense of lack of novelty and invention come with rather poor grace from one who is asserting that even after the complainants' patent there was still room for invention."

It seems to me the defendant has placed his own estimate on the value of plaintiffs' invention as being something desirable and

13 F.(2d)—16

worth while. I have examined the various prior patents relied on as the prior art, and find no disclosure that conflicts with the Winchell or Sandusky patents as above discussed; such patents, among others, being the Budlong, No. 270,393, 1883, relating to belt fasteners; Talbot, No. 219,184, 1879; Remus, No. 368,423, 1887, another belt fastener; Gordon, No. 372,140, 1887, another shank stiffener; and Peterson, No. 395,628, 1889.

They cover the shoe shank with a single tooth, and similar ideas are expressed in the two dozen prior art patents cited. I have examined particularly the two patents, to wit, the Watson, No. 403,569, issued on May 21, 1889, and the Cangen patent, No. 1,236,820, August 14, 1917.

The Watson patent, for some reason, had been overlooked by the usually alert eyes of the shoe trade for one-third of a century. I doubt if this was oversight. I fail to see that it is either similar in construction or analogous in the use of plaintiffs' patents. The Watson shank is flat, and not arched. It provides for the very thing that the plaintiffs' shank seeks to avoid. It extends into the heel of the shoe. It does not act as an arch. It has no groove, at least to any extent. I agree with counsel for plaintiffs that there are inconsistencies between the drawings and the descriptions, so that it is somewhat difficult to find exactly what was disclosed.

In the Cangen patent, we there have a flat piece of springy steel, and a great similarity between it and the Watson patent; besides, the Cangen patent was in the Patent Office at the time both the Winchell and the Sandusky applications were filed. It seems difficult to understand, if either the Watson or the Cangen patent anticipated, how the patents to Winchell and Sandusky were granted, particularly after an interference suit. The mere fact that Cangen put some teeth on his shank I attach little importance to, and it does not seem to me that this Cangen patent is such an anticipation as would invalidate the Winchell patent.

There can be no attempt on the evidence here, nor do I think plaintiffs intend to argue such attempt, to say, that, upon the coming out of plaintiffs' patented shank, all other shanks became obsolete, nor that there were not a possible continued use of different shanks. Some manufacturers prefer to keep to styles almost obsolete, and yet do a good business. Others may go to the other extreme.

The general trend of the market, however, indicates that in plaintiffs' shank there was something which at once received a large and continued and present commendation and demand, and therefore the mere fact that other shanks were used, unless such use accurately or substantially disclosed to the public a particular invention, subsequently allowed to the plaintiffs by the United States Patent Office, should not be cause for a failure to protect the maker of a new shank, which apparently is supplanting, by its novelty and applicability, these other shanks in the market. It is easy to say that, in imitating plaintiffs' shank, the defendant's shanks are not imitating it, but are imitating a prior shank, which in turn invalidates plaintiffs' shank, and thus open the door to defendants to in fact imitate plaintiffs' shank, and enjoy its advantages when charged with infringement.

[2] Under such circumstances it becomes necessary to see that this prior shank, used as a shield substantially, is a disclosure to the public of plaintiffs' shank, and, where there is a doubt as to such disclosure, that doubt should be given, it seems to me, to the plaintiffs, in view of the fact that a patent has been duly granted by the Patent Office (Hunt Bros. Fruit Packing Co. v. Cassidy, 53 F. 257, 3 C. C. A. 525), especially where the claim is made, not that defendant's shank is being manufactured under said prior patent, but is being made, either independent thereof, or under its own patent, which, as I have said, covers, if anything, a disclosure of a mere improvement, to make the shank more springy, but otherwise infringes.

[3, 4] Accordingly, it is my opinion, for the foregoing reasons, that defendants are infringing the patents of plaintiffs, which are found to be valid, and that therefore plaintiffs should have a decree.