## INGERSOLL–RAND CO. v. WESTING-HOUSE ELECTRIC & MFG. CO.
### No. 6125.

District Court, E. D. Pennsylvania.
Sept. 22, 1936.

George F. Scull, Chester A. Adee, and Charles Kingsley, all of New York City, for plaintiff.

Harvey Lechner, of Philadelphia, Pa., Drury W. Cooper and Victor S. Beam, both of New York City, and A. B. Reavis, of Lester, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a suit in equity for infringement of United States patent, No. 1,550,332, to Bancel, relating to an improvement in the construction of surface condensers. Claims 1, 2, and 3 of the patent are in suit.

In condensers of the kind with which the patent is concerned, the steam from the exhaust of the prime mover (which in modern practice is usually a steam turbine) is discharged into a closed, cylindrical vessel or shell, the greater part of which is occupied by a bank of tubes extending longitudinally across it, through which cool water flows from one side to the other. As the steam comes into contact with the tubes it is condensed, leaving a partial vacuum, and so reducing the back pressure upon the turbine and greatly increasing its efficiency.

As the water in the tubes flows towards the outlet end it naturally becomes warmer and as a result its capacity to condense steam decreases, so that it takes more tubes to condense a given amount of steam at the hot end than at the cool end. Now the patent specification points out that when just enough steam to be entirely condensed by the hot end is coming into the condenser the steam at the cold end will be all condensed before it reaches the lower tubes and there will be a certain amount of cooling surface at the cold end of the lower tubes which will not be condensing steam.

The plaintiff contends that if this surface is made available for condensing, the size and initial cost of the condenser may be reduced and in addition a saving effected in the pumping of water. This seems obvious. Not so obvious, to me at least, is the explanation by the plaintiff's expert as to the way in which utilizing of all the parts of the tube bank for the purpose of condensing steam has some further effect in increasing the turbine's efficiency by creating a higher vacuum. Nor is it to be assumed that the comparatively small part of the tube bank which does not actually condense steam is pure waste. In many condensers it has a definite function in cooling the air after condensation has taken place—something which must be done either in the condenser or outside it, as will appear later. However, we may take it that the result which the plaintiff's patent is intended to accomplish is sufficiently advantageous to give it commercial utility.

■ With this explanation in mind we turn to the claims of the patent. Claim 1 is typical. It is as follows: "A condenser having tubes with different temperatures along their length resulting in unequal capacities for condensing steam in vertical sections along their length, and means for obtaining substantially equal depth of penetration of steam in said sections along the length of the condenser."

This, as it stands, is simply a claim for a result, in a certain type of condenser, and for means, generally, for accomplishing it. Under well-known rules which forbid the patenting of results and broadly functional claims it is invalid, unless for some reason those rules do not apply. I have carefully considered the argument advanced by the plaintiff to avoid them, but it is not convincing. Briefly the argument is: (1) That Bancel first discovered the fact that a portion of the tube bank at the cold end does not condense steam, and thus disclosed to the world a serious drawback in condensers as they were then constructed. (2) That the claim should be read in connection with the specification, and when so read is limited to certain specific methods of remedying the defect disclosed. (3) That, inasmuch as a true discovery is involved, extremely simple devices which otherwise might not be patentable will be accorded the quality of real invention.

For the last proposition, the plaintiff relies principally upon the decision of the Circuit Court of Appeals for the Third Circuit in Cunningham Piano Company v. Aeolian Company, 255 F. 897. The ruling of that case is, of course, accepted unreservedly as the law, and it is quite true, as the plaintiff contends, that very slight, simple, and obvious changes in structure often take on the quality of invention when they are the result of an important discovery. I shall also accept, provisionally (although it seems very improbable), the plaintiff's first proposition, namely, that until Bancel's disclosure, no mechanical engineer ever knew or suspected that portions of the cold end of a surface condenser were not condensing steam. The difficulty with the plaintiff's argument lies with his second proposition.

In the first place, the language of the claims themselves is so broad that it precludes resort to the specification. There is a limit beyond which courts will not go in sustaining "means" clauses. It is well defined in Davis Sewing Machine Company v. New Departure Manufacturing Company (C.C.A.) 217 F. 775, 782. In that case the courts sustained a means clause, holding that such a clause may be unobjectionable where it is used "with reference to elements or parts of the combination already well-known and designed only to co-operate with the new element in order to make a completely operative unit." Or, as the court later said, "with reference to the connecting parts which permit the salient novelty of the invention to accomplish its function." In such case the means clause is "only a convenient formula of the broadest equivalency of which the real invention permits."

The claims in the case at hand are far broader than those in the case just cited, or in any other case which I know of in which a means clause has been sustained. The Bancel combination consists of two elements only—first, a certain type of condenser, and, second, the "means." The "means" are not designed to co-operate with any new element, but they are the new element, embodying all there is of novelty in the combination and claimed generally in terms of function or result. I do not see how any one, given the result which Bancel's patent sought to obtain, could draw a broader claim, or one which, if sustained, would confer a wider monopoly. Unless the view be adopted that every patent with functional claims must be read as limited by the specifications—a view which would practically rewrite the patent law—it is plain that these claims cannot be sustained in that way.

What the plaintiff really wants the court to do is to substitute the specification for the claims. This, of course, cannot be done. After all, the claim is the grant, and the only purpose for which the specification may be resorted to is to ascertain what was intended by the claim—in other words, to construe its language. If, in spite of suggestions of various specific structures, the specification taken as a whole merely confirms the view that the claims mean what they say, namely an attempt to cover a result and all possible means of obtaining it, the patent will still be invalid. Now, a careful reading of specification of the Bancel patent leaves one with an even stronger impression that this was exactly what was intended. The patentee sets out seven concrete exemplifications of his thought. They cover three general methods: (1) Increasing the flow of steam into the cold side by directing a larger volume into that side from the turbine exhaust; (2) decreasing the volume of steam on the hot end by various resistance devices, such as baffles or bunching of tubes; and (3) exhausting the air from the condenser by a more powerful pump on the cold side than on the hot side. In other words, he points out that in order to accomplish his result you can either force more steam into the cold side, or pull more steam through it, or block the flow on the hot side. All of these methods may or may not involve the idea of equalizing the pressure drop in both sec-

tions. There was a dispute as to this, but I do not think it makes any difference whether they do or not. It seems clear that in the nature of things that there are no ways of getting an equal flow of steam through all sections of the condenser such as the patent describes, without resorting to one or another of the methods pointed out in the specification. Of course, I mean within the fair limits of equivalency.

The suggestion that the Frey patent, No. 1,729,309, shows a way of accomplishing the result not specified by the patent is without merit. Frey's method is to introduce the circulating water at both ends of the condenser simultaneously. He disclosed a means of securing utilization of all the surface of a condenser, but not the kind of condenser which Bancel was concerned with. The Bancel patent related only to condensers in which the tubes have unequal capacities for condensing steam in vertical sections along their length. It seems to me that, after reading the specification, there can be no doubt that when Bancel spoke of "vertical sections," he meant vertical sections of the tube bank and not vertical sections of each individual tube. Bancel's claims are for means for accomplishing a certain result in a type of condenser which Frey did not undertake to deal with.

The conclusion is that the claims in suit are invalid as constituting an attempt to patent a result by claiming all means of accomplishing it, the means being described solely in terms of their function which, in turn, is the result desired.

In a suit involving the same patent in which the Worthington Pump & Machinery Company was the defendant, decided December 12, 1935, Judge Bondy has taken the same view.

The conclusion is sufficient to require dismissal of the bill. Certain other issues, however, are properly before this court and may be of importance in the event of appeal. In view of the principal conclusion, only the briefest discussion will be added.

1. The patent is anticipated by the Weir British patent, No. 365, of 1893.

There is no possible question that the structure patented by Weir could, without change, be operated to produce the result which Bancel has claimed and which is the essence of his alleged discovery. It

is scarcely distinguishable at all from the exemplification shown in Figure 7 of the Bancel patent. The plaintiff's expert, Mr. Ray, so testified, practically without qualification. In answer to the question " * * * granted that you think it is desirable to get an equal penetration of steam * * * in these different compartments, you can do it very easily?" he said, "It could be done by the regulation of those cocks; theoretically, at least * * * If you knew the problem and knew the results to be obtained." And later on, "You would have to know those things, but if you do know those things, it would seem to me that this device could be adapted to that purpose?" Answer, "I think there is no question about that."

It may be true that Weir's purpose was not so much to obtain complete penetration of all parts of his condenser by the steam as to enable him to put entire sections of it out of operation temporarily in order to save fuel during periods when its full capacity would not be required. This seems the more probable, since he was dealing with marine engines in which full capacity was not often required and in which fuel conservation was of the highest importance. Nevertheless, there is nothing to exclude the Bancel idea from his statement of his invention, and the fact that his stopcocks are "adjusting," and that it is pointed out that "action in the several compartments" might be "regulated" by them rather strongly indicates that he had it in mind.

Of course, Weir did not state the problem as Bancel stated it. So far as he was concerned it was a minor consideration, and, as a matter of fact, there has been no evidence to show that it was a matter of any great concern to any one or that it presented any very serious difficulties. Weir was certainly fully cognizant of the fact that if he increased the suction of any one of his air outlets steam would be drawn down through the entire compartment affected, because in referring to one of his drawings he instructed that the adjustment of the stopcock should be such that "the air pump may not draw off steam, the doing which would require increased power to work it without improving the vacuum." Beyond all this, even if Weir did not foresee one of the results which his device would accomplish, his patent would still invalidate a later patent which adds nothing whatever by way of physical structure, but in substance merely points out a way in which the device can be operated to obtain such result.

Judge Bondy also ruled that the Weir patent anticipated the patent in suit.

2. Upon the question of infringement, the defendant's First Brooklyn Edison Form presents the same critical features as the Weir British patent just discussed.

The plaintiff cannot seriously controvert this proposition. He endeavors to differentiate the two by reason of the fact that Weir's patent gives no instructions by which it may be operated to produce the result claimed by Bancel. It has just been pointed out that the absence of such teaching did not prevent the patent from anticipating. It follows that, as to the defendant's first accused structure, the matter of infringement need not be considered.

3. If the claims of the patent in suit could be limited by the specification in the manner in which the plaintiff argues that they should, the defendant's Second Brooklyn Edison Form would not infringe.

This requires a brief reference to another feature of these condensers which it has not been necessary to mention up to this point. In addition to the steam, a small amount of air is constantly entering the condenser by leakage or otherwise. Unless this air is removed as fast as it gets in, the vacuum will be diminished and ultimately entirely lost. Therefore, it is necessary to have an air outlet and a pump to draw the air off. Even after all the steam is condensed, a certain amount of vapor will remain in the air, thus increasing the volume to be removed and giving the air pump extra work to do. If this air and vapor mixture is cooled before it leaves the pump its volume will be greatly reduced.

Now it is conceded that in condensers in which the Bancel effect is not present the part of the tube bank which does not condense steam does some work in cooling the air. If the entire tube bank is put to work upon the condensation of steam, then it will be necessary to provide cooling means for the air outside the condenser before it reaches the pump. All the exemplifications of the Bancel idea utilize every inch of tube space for condensing, that being the essence of the concept.

The defendant's Second Brooklyn Edison Form does not do this. While it em-

bodies certain features of the Bancel structures, it does not obtain "substantially equal depth of penetration of steam" as set out in claim 1. Claim 2 requires merely "increasing the depth of penetration in the vertical sections in which the cooler water has more heat absorbing capacity." But it must be remembered that the plaintiff has insisted that we read this claim like the others, with the specification, and if that were to be done, there would be no escape from limiting it to devices in which all surfaces of the tubes work to condense steam, and none of them have an air cooling function.

### The Counterclaim.

The defendant has counterclaimed for infringement of United States patent, No. 1,347,436, to Bauman. This patent has to do with the support of the assemblage consisting of the turbine and the condenser. Ordinarily, condensers are placed underneath the exhaust of the turbine. In some cases the condenser has been supported entirely by its attachment to the turbine exhaust. In others it has been separately mounted upon a rigid base, below and separate from the rigid base upon which the turbine is mounted. The latter construction required an expansion joint between the condenser and the turbine to compensate for relative shifting of the two members due to unequal expansion or distortion.

The central idea of the Bauman patent is to base the end (water inlet and outlet) parts of the condenser, together with most of the load of the tube bank, upon separate rigid supports and to mount the shell (with some of the weight of the tubes) depending from the exhaust of the turbine. To take care of relative shifting of the parts, expansion joints are provided between the portion of the shell which depends from the turbine and the ends which are mounted upon rigid supports.

A number of issues are raised as to this patent.

■ 1. The plaintiff's accused structure undoubtedly infringes the patent, if valid. The general apportionment of the load and the functioning of the supports and expansion joints is the same. The only departure from the patent is that it puts a somewhat larger portion of the weight of the tubes upon the support of the condenser shell depending from the turbine exhaust than the patent does.

■■ 2. The patent is not invalidated by abandonment or dedication to the public of the subject-matter. The claims of the patent originally were included in the application for an earlier patent, No. 1,277,830. Division was required and those claims canceled. Application for what were thus treated as divisional claims was not made until twenty-nine days after the earlier patent issued. The plaintiff contends that these facts are sufficient to establish a dedication of the subject matter of the claims to the public, and cites Gladding-McBean Corporation v. N. Clark & Sons (C.C.A.) 16 F.(2d) 50.

I confess that I am not able to reconcile the decision in that case with what appears to be the weight of authority and the better reason. See American Laundry Machinery Company v. Prosperity Company (C.C.A.) 295 F. 819; Eclipse Machine Company v. J. H. Specialty Mfg. Company (D.C.) 4 F.Supp. 306; American Optical Company v. Shur-on Optical Company (D.C.) 9 F.(2d) 932, affirmed (C.C.A.) 16 F.(2d) 1013.

Abandonment is a question of fact and depends upon a finding that there was an intention to abandon. Where the subject-matter of the second patent is a truly divisible separate invention and where the Patent Office requires division, the intention to abandon, if it is to be found anywhere, can only be found from delay in pursuing the divisional application. I do not think that it can be laid down that a failure to apply during the pendency of the first patent or until a month after its issue is conclusive evidence of abandonment. In addition, in the present case there is another fact which is in favor of the patentee on this issue. He had, in 1916, applied for and in 1917 received a British patent covering the subject-matter of the patent in suit in the counterclaim (the second American patent). Under the Nolan Act, 35 U.S.C.A. §§ 80–87, his priority rights as to the date of the British application were in existence when his first American patent issued. Apart from the question of law, which it is unnecessary to discuss, this has a definite bearing on the

fact question upon the intention to abandon.

3. There is no question that the defendant's structure is novel and useful. The plaintiff's principal witness agreed that none of the earlier patents "show the condenser shell suspended from the turbine with water boxes separately supported and connected by expansion joints to the shell ends." The only serious question is whether invention is involved. Of course there was nothing new about the use of expansion joints to take care of the relative shifting of members of a structure and naturally they had been used in heating or condensing apparatus (Renshaw, British patent). The Ehrhart patent, No. 1,116,042, cited by the plaintiff, is an arrangement by which the condenser is suspended from the turbine bed plate and connected with the turbine by an expansion joint. The principle of this patent seems to be that when in operation the lifting force of the vacuum in the condenser causes an upward thrust which must be taken care of in some way, and this is done by an expansion joint between the upper end of the inlet nozzle of the condenser and the turbine. Stops were provided to counteract or check the upward thrust. Bauman shows a distribution of the load between its supports radically different from that of Ehrhart or any other patent which has been cited. In view of what appears to me to be a definitely novel construction, I am unable to say that the prior art offered is sufficient to overcome the presumption of validity arising from the grant of the patent.

I therefore hold that the patent involved in the counterclaim is valid and infringed.

Decree accordingly.