### FORCHHEIMER et al. v. FRANC, STROHMENGER & COWAN, Inc.

Circuit Court of Appeals, Sixth Circuit.
July 8, 1927.

No. 4547.

**1. Patents ⬅328—1,447,090, for neckties, held invalid for lack of invention.**

Langsdorf patent, No. 1,447,090, for neckties, *held* invalid for lack of invention.

**2. Patents ⬅17(1)—Merely carrying forward thought to greater degree, or extending it, is not "invention."**

Merely carrying forward of thought to greater degree, or extending it to other parts of article, does not constitute "invention."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invention.]

**3. Patents ⬅26(1¼)—Invention may result in combination of old elements making improved construction.**

There may be invention in a combination of old elements resulting in an improved construction with new and better functions.

**4. Patents ⬅36(2)—Favorable public reception of new product is evidence of patentability.**

A favorable public reception of a new product is evidence of its patentability.

Denison, Circuit Judge, dissenting.

Appeal from District Court of the United States, for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Patent infringement suit by Franc, Strohmenger & Cowan, Inc., against Baro Forchheimer and others. Decree for plaintiff, and defendants appeal. Reversed.

O. Ellery Edwards, Wm. Houston Kenyon, and Charles E. Hughes, all of New York City (Joseph L. Levy, of New York City, and Klein, Harris & Diehm, of Cleveland, Ohio, on the brief), for appellants.

Clifford E. Dunn, of New York City, and Frederick P. Fish, of Boston, Mass. (John F. Oberlin, of Cleveland, Ohio, and Charles Neave, of New York City, on the brief), for appellee.

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

MOORMAN, Circuit Judge. [1] This appeal from interlocutory orders of the District Court for the Northern District of Ohio involves validity and infringement of the Langsdorf patent for neckties, No. 1,447,-090, issued upon an application filed April 12, 1922. There are five claims in the patent, the first four of which were held valid and infringed and the fifth held invalid. They are set out in the margin.[1]

Langsdorf's tie consists of a body or outside portion of silk cut on the bias, a woven fabric resilient lining cut on the bias, and loose stitching connecting the body portion with the lining. These elements are embraced in the claims that were upheld. Claims 1, 2 and 4 specify "a woven fabric resilient lining," which would seem to include any woven fabric that was resilient, whether cut on the bias or not, and the third claim specifies a woven fabric cut on the bias, apparently covering any woven fabric cut on the bias, whether resilient or not. In the specifications Langsdorf said that his lining was made of woven fabric "cut on the bias," which is true, though claims 1, 2, and 4 are not so limited, as was decided at the supplemental hearing against the Stern-Merritt

---

[1] 1. A necktie, comprising a body portion including a knot-forming part and a woven fabric resilient lining connected thereto, said resilient lining extending into the knot-forming part of the tie.

2. A necktie, comprising a body portion, and a woven fabric resilient lining connected therewith by loose stitching.

3. A necktie provided with a lining attached thereto and consisting of woven fabric cut on the bias.

4. A necktie comprising a body having folds, a woven fabric elastic or resilient lining in the tie body, and loose stitching uniting the folds of the tie body and connecting the woven fabric elastic or resilient lining thereto.

5. A necktie provided with a lining comprising a strip of woven material resilient in the direction of the length of the tie.

Company, involving the later product of that company, in which it used a lining not cut on the bias but almost as resilient as the lining it had previously used. The invention, if there is any, resides in claims 2 and 3, which cover the body portion, a woven fabric resilient lining (the resiliency being acquired, if necessary, by cutting the fabric on the bias), and loose stitching by which the lining and body are connected. The function of the loose stitching is to permit the body portion and lining to stretch and yet to hold them loosely together.

The silk material from which the body portions of ties are constructed has been cut on the bias for many years for the purpose, or at least the partial purpose, of adding to the attractive appearance of the tie. When so cut it has an extensibility that lends itself to the functions of a resilient lining, but it is not claimed that Langsdorf discovered its utility or is entitled to any preference in its use. The resilient lining is an element of greater importance and is said to be entirely new in the art. It is mentioned in four of the five claims of the patent and may be said to be implied in the reference in the other to cutting on the bias. Langsdorf claims that he discovered its utility and was the first to use it in neckties. His specifications say that theretofore, in an effort to relieve the tendency to distort the body of the tie, which, because the silk was cut on the bias, was more or less elastic, "inelastic lining had been employed and stitched to the folded portions of the tie particularly throughout the neck portion thereof;" and he claimed that the lining that he proposed to use, and which he does use, elastic or resilient in its nature, was an innovation in the tie-making art which, when combined with other elements making for utility, would result in a new kind of tie, which when pulled would stretch without breaking the threads and when released would return longitudinally and transversely to its original shape.

The lower court interpreted the patent as covering a lining less elastic than the body of the tie, finding some merit in its functions as so limited. Further than what was referred to in the specifications, as we read them, as a lining certainly as elastic as the body material and perhaps more elastic, nothing was said about the degree of resiliency. Resiliency is a relative term, and undoubtedly none of the ties formerly used possessed so much resiliency, either when cut straight or on the bias, as the Langsdorf ties. We are equally sure that some of them did possess a degree of resiliency—enough to come within the phrase "a woven fabric resilient lining." The ties of Tremmett, Keys and Lockwood and other manufacturers possessed resiliency in the knot-forming part brought about by several folds of the diagonally cut outer portion, or by separate linings of the same material placed in the tie. If the term "woven fabric resilient lining" means something different from the body fabric itself, having distinct and useful qualities, these ties would clearly not anticipate Langsdorf; but if it means any woven resilient fabric inside the outer layer of the tie, there would, we think, be anticipation. Langsdorf does not say in terms, either in his claims or specifications, that he had in mind a lining fabric separate and different from that of the body of the tie, and yet the implication may be fairly said to be found in the detailed description of the specifications.

Prior to Langsdorf many different fabrics had been used for linings—among them nap cotton, or what is known as canton flannel. Heath, No. 335,071, issued January 26, 1886, speaks of an interlining piece of "comparatively stiff, yet soft and pliable material —such as fine linen canvas—which because of its extended form is longitudinally elastic." There is evidence, without doubt, that the material that Heath used possessed some resiliency, certainly that it was his idea to use a lining which would accommodate itself to the resiliency of the outer part or what he refers to as the "scarf strip * * * cut bias." If Heath had only supposed that the lining that he described possessed a resiliency that would accommodate itself to the same quality in the body when in fact it would not, his product could not be considered an anticipation; but the evidence shows that the material that he used was resilient, sufficiently so, we think, to read upon the claim descriptions of that quality in Langsdorf.

[2] Canton flannel had been widely used as a lining and was undoubtedly resilient. The plaintiff's witness, Dyer, said that a canton flannel lining, if subjected to a pull of ten pounds, would stretch three inches or more— probably as much longitudinal stretching as desirable in a tie—but that a month afterward it would remain stretched about two inches; and while he said that when cut straight it had little or no plastic stretching, we think his evidence, with that of others, shows that when so cut it possessed some degree of resiliency. One of the exhibits in evidence shows a canton flannel lining in one end of the tie running up to the side of the neck and in the other end a light cotton lining running up the same way. The canton flan-

nel part of this lining stretches and returns, not of course to the degree that Langsdorf's lining does, as nothing else in the prior art did, because, if that function had formerly been thought useful, there was no such material as resiline which Langsdorf uses and which, as we shall later see, is largely if not wholly responsible for the success of his ties. Nevertheless there was resiliency, though not so much as in Langsdorf nor in the entire length of the tie; and the carrying forward of that thought to a greater degree, or the extending of it to other parts of the tie, was not, we think, invention. Railroad Supply Co. v. Elyria Iron & S. Co., 244 U. S. 285, 37 S. Ct. 502, 61 L. Ed. 1136.

The lower court seemingly attached more importance to the loose stitching than to the other elements of Langsdorf's claims. We think the loose stitching was old, even in neckties, although we are not prepared to say that the exact form used by Langsdorf, though not described in his specifications or claims, had theretofore been used. Loose stitching with the bar tacks at the end of the body material had been used, and that form accommodates itself to the resiliency of the lining and body quite as satisfactorily, it seems, as does the unfastened and knotted ends of the thread. The loose stitching is simply what is otherwise known as basting, having been used from time immemorial, and the most that can be said for it in connection with Langsdorf is that it was the expedient—perhaps new in neckties in the form that he used but not in others equally effective—of reducing to practice his conception of the resilient lining. He cannot, we think, claim a monopoly on its use.

[3, 4] It is undoubtedly true that there may be invention in a combination of old elements resulting in an improved construction with new and better functions, Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; and it is equally true that a favorable public reception of such new product is evidence of its patentability. Langsdorf's ties have been received with unusual favor. That, in our opinion, is mainly if not entirely due to the discovery and use of resiline, which, when cut on the bias, possesses extraordinary qualities for the lining of neckties. We do not mean that there are not other fabrics of both earlier and later origin which possess the same qualities in a lesser degree, but that the extraordinary resiliency of resiline is largely responsible for the success of the neckties that Langsdorf has made. This resiliency prevents wrinkles and creases from permanently forming in the knot-forming portion of the tie, something that is highly desirable and that no other lining had done. It is a woolen fabric, manufactured by Holbrooks & Co., and was discovered shortly before Langsdorf filed his application for a patent. He had seen, he said, an English fabric which he thought adaptable to his idea; but little of that fabric, if any, beyond the making of a few ties, was ever used, and it was not shown that it possessed the permanent qualities that he desired. Upon seeing resiline he requested his attorney to insert into the application for the patent the term "resilient" in connection with the term "elastic," and immediately contracted with the manufacturer of resiline for his entire output, taking it for several months.

During that period his business was built up enormously under the trade-name "Resilio," probably suggested by the name of the lining. It cannot, of course, be claimed that his patent covers the newly discovered resiline, nor, in our opinion, does it cover all stretchable or resilient ties. There had been some resiliency in the older ties. The body of the tie had always been made from silk cut on the bias, and linings had been used which were not so resilient as one made from resiline but were sufficiently resilient, we think, to come within that element of the patent claims. Loose stitching was old and had been used from time immemorial. Every one who works in fabrics knows that certain woven materials cut on the bias will stretch and will return to their normal shape, and that to permit fabrics sewn together to stretch cooperatively the stitching must be loose. Langsdorf was, perhaps, the first to think of the utility of greater resiliency in neckties. He did not seek and find something that the art had been striving for, as in Kurtz v. Hat Lining Co. (C. C. A.) 280 F. 277, and Van Heusen Products Co. v. Earl & Wilson (D. C.) 300 F. 922, but thought of the utility of a function never before considered valuable in the art. This conception was made practicable by the simple means of combining body silk cut on the bias with a woven lining cut on the bias by stitching them loosely together. Every element was old and had, we think, been used in the art of necktie making—never, however, with the result attained by Langsdorf due, as we believe, to the fortuitous discovery and his ability to procure the entire supply of a fabric of greater resiliency than had theretofore been available for lining purposes. It may be true, as we have said, that he first thought of the utility of a tie that would stretch to the extent that his product does without breaking the threads

that joined the lining to the body; but that was not invention, and it was not difficult, with the proper materials, especially after the discovery of resiline, to create the tie. Any intelligent sewing- woman with the same objective and having the same materials that he had could have done it, we think, without trouble.

Judgment reversed.

DENISON, Circuit Judge. I dissent. While the question of invention is in some degree one of fact, yet it so involves the general point of view from which the controlling legal principles are seen that I feel justified in expressing my reasons.

Considering situations somewhat analogous to this—peculiarly so in that they, like this, involve a seemingly simple modification in a common article of clothing—two of our most experienced patent judges have recently made comments in language which might as well have been written for this case. In Kurtz v. Belle (C. C. A. 2) 280 F. 277, we have one of the best reviews of the question of invention to be found in the books. On page 282, the late Circuit Judge Hough said:

"If we view this hat lining, or any hat lining, in the light of our own experience, it would appear trivial and unworthy the dignity of patent protection; but, looking at it through the evidence and (we hope) with the eyes of the hat lining trade, this patent represents a large and successful business. It is in the minds of all those who deal in hat linings, of the utmost importance. No one ever made a lining of such simplicity, cheapness, and general adaptability as has Kurtz, and he has done it by mechanical means of winning simplicity, to all of which defendant has testified by deliberately imitating Kurtz's product and engaging in expensive litigation to defend the imitation."

Speaking of a slight change—seemingly very slight—in weaving the fabric intended for unstarched collars (Van Heusen v. Earl & Wilson, 300 F. 922), Judge Learned Hand, said on page 925 (after reviewing the art), "Something had obviously occurred in the collar industry of major importance. * * * To any one in the least familiar with patents it must be evident that an invention of high merit had appeared in this art. * * * It is quite idle by logistic niceties to try to obscure this outstanding fact." Indeed, the analogy between the semi-soft collar case and the present one is so unusually close, and to my mind that opinion so well interprets the point of view which

a court in this situation ought to take that I review and quote from it more at length.

Multiple-ply interwoven fabric was common. It was made more or less stiff by the closeness of the weave. Stiff starched collars were common, as were soft unstarched collars. Many efforts had been made to stiffen up the latter type so that they would not so easily break. Nothing had been developed which proved acceptable. Bolton conceived that by using multiple-ply interwoven fabric for the collar and by weaving it more closely than usual, he would get a collar which would be stiff enough to maintain its satisfactory appearance and soft enough to be comfortable. This was the whole invention sustained in Judge Hand's opinion, and sustained because of the extent to which the industry and the public accepted the new thing.

Page 924: "Van Heusen's collars appeared in April, 1921, and almost at once got a vogue which puts it beyond any doubt that they indeed answered the proverbial long felt want. This conclusion is corroborated by the history of the art [reviewing many prior patents]. * * * It is clear that in such a field the winner had not expounded a text which he who runs may read. * * * Before the year was out his success made it industrially necessary for the defendants to put on the market the present alleged infringements, which were quite new in their manufacture, and from that time forward the 'semi-soft' collars began to drive the older 'soft' collars off the market. * * * This was accomplished without any unusual cost of advertisement; the plaintiff's expenses for this purpose were no greater than for starched collars, and were small indeed, considering that a new commodity was being introduced. * * * For reasons, real or fancied, the public had at length found a collar which suited its needs as nothing else had done theretofore. The business grew enormously in the succeeding three years. * * * The public had got something which it had been wanting for 20 years, and which after repeated efforts nobody had found before. The defendants recognized this at once, and trimmed their sails to the prevailing wind, as they had to."

"I am faced with the usual collection of cases to prove that it is never invention to substitute one material for another. Cases like Hotchkiss v. Greenwood, 11 How. 248 [3 L. Ed. 683], * * * might indeed be piled up indefinitely. I do not conceive that the law has ever laid down any such absolute rule

on this subject, or any other absolutes for that matter. The prospect of getting objective tests for invention is tempting, but it is a mirage. How is it possible to say a priori what combination of elements needs an original twist of the mind, and what is within the compass of the ordinary clod? Is it not clear that the quality of a man's inventiveness must be tested by reconstituting the situation as it was in the light of the preceding history of the art? There is no vade mecum for such inquiries. Our unknown ancestor, who first substituted iron for bronze in the head of an axe, was the bright examplar of all inventors to come. Yet it was not an invention, if one is bound by this objective test. In this subject the standard escapes any abstract definition, because the end in view needs nicer adaptations, as in the cases of due care or notice. The defect of such a standard is indeed its uncertainty, but certainty is only one of the ends of law." Page 929.

" * * * What, then, it is very properly asked, is there left of Bolton's invention, if it be so broadly construed as the plaintiff must construe it? Is the patent to depend wholly upon a new use to which such a fabric should be put? Is it not a well-settled part of the law of patents that new uses are not patentable? To this I answer that, if it were true that any multiple-ply interwoven fabric made into a collar would, in Bolton's words, inevitably 'maintain its shape without the employment of starch,' I should say that Willard's disclosures were an anticipation, because one had only to practice it as it reads and one would get the present collar. But this is not the truth. Willard had no such purpose in mind, and one might go on forever following his patents, without ever making a starchless stiff collar. True, one might by accident hit upon a properly close weave and interweave, but it would only be by accident. To be a proper anticipation, a reference must go further than that; it must tell you how you can get with certainty the result you are after." Page 930.

If we transfer all this comment to the field of fine silk four-in-hand neckties, and for "semi-soft" substitute "resilient," we have the present case. Neckties of fine soft silk had been long in use; they were too soft and stretchy; many efforts had been made to provide a lining which would give strength and body and which would minimize if not prevent the stretching distortion; Langsdorf conceived that by abandoning the idea of a firm and rigid lining and by adopting formerly known material, put into a new form specifically adapted to this purpose, he could make this type of necktie successful, and get one which would stretch enough to be tractable in handling but which would come back to and maintain its shape as no tie had ever done before at all, or has ever done since save by adopting his idea. He substituted bias-cut fabric woven from hard twisted wool for straight-cut loosely woven cotton fabric. Existing fabrics could have been selected from and cut out to get his result, but they would have been hit upon by accident. Without much advertising, extraordinary success followed; everything else in this field has nearly disappeared from the market; and the defendants as well as many, and apparently all, competing manufacturers have been compelled to follow his lead. I am convinced that unless the collar case was wrongly decided this Langsdorf patent should be sustained; and I think Judge Hand correctly applied the principles involved.

I agree with my associates that the element of loose stitching is not of much importance. I think it has been over emphasized in the argument here, and perhaps in the opinion below. Given the basic idea of the stretchable outer covering and the resilient lining, it was seemingly obvious to any seamstress that if the two were to be united, it must be by stitching loose enough not to bind against the stretch and return. The loose stitching only provided the obviously necessary environment to permit the inventive idea to be operated. Its inclusion as an element in the claims did not help them; nor did it hurt them.

Of course the patentee is in trouble if we think of the word "lining" in his claims as a word which is satisfied by anything which is upon the interior surface of anything else; but that is not what he means. He is talking about a necktie lining with certain qualities and effects and for certain purposes. It is no answer to refer to constructions which, while linings in a certain broad sense, did not have his qualities, purposes or effects. By "necktie lining" the trade and the public understood, not continuations of the outer fabric winding within itself, or mere stuffing, but an independent portion giving body and strength. It stands without dispute, as I understand the record, that no one had ever before put into a necktie, a lining which did give body and strength and which, while permitting stretchability, confined that stretchability to the limits of resiliency, and was so constructed that the necktie as a whole would, not in vague theory but in daily practice, stretch a substantial distance, three or

four inches, and then immediately, in all its length not held, return to its original length, and thus retake its original smoothness and form. According to the testimony and according to the sample exhibits, ties made according to the patent give satisfactory performance in these respects, while in others, older or later, these qualities and capacities dwindle down to relative insignificance.

I am not able to find in the history of the fabric "resiline" the importance which my associates give it—indeed, I see no materiality in it. There was nothing substantially new about resiline. It was a wool fabric, woven with some skill, so that it would be particularly capable of resisting the tendency to crease when folded or bent, and then of coming back to its flat shape. This made it suitable for the lining of coat fronts and lapels, and would have been a quality of some value in necktie linings. It had never been actually used by anybody for any purpose, until Langsdorf bought and used some after his invention was completed and his patent application filed; the first sale of it ever made was to him. The evidence, confirmed by our inspection of the samples, shows no substantial difference between this resiline and the imported English fabric which Langsdorf had used in reducing his invention to practice for his patent office model. The record does not show why Langsdorf adopted and used resiline rather than the English fabric. It might have been slightly better; it might have been and probably would have been cheaper; it would have been advantageous to buy at a nearby factory and control the output. No one of these reasons has, nor would all together have, so far as I can see, any bearing on the patentability of this invention. Langsdorf either had made a patentable invention or else there was no invention about it—all before resiline appeared on the scene. Judging again by the evidence, confirmed by an inspection of samples, I am satisfied that resiline when cut straight had no substantial resilience in the sense in which the term is here of importance, viz. the stretch and return capacity. As then constructed, it was of no use in this invention unless it was cut on the bias; and no one ever had cut it on the bias or had thought of doing so.

Upon the whole case, I think Judge Westenhaver reached the right conclusion as to patentability. When for many years the practical art has been trying to get a result by efforts in one direction and, by abandoning those efforts and turning in the opposite direction some one, though in a very simple

way, gets a new thing, which the whole trade at once accepts as satisfactory and which largely displaces all competition in its immediate field, a court must be exceedingly sure of its ground in order to reverse the verdict of those long familiar with the subject in its practical aspect. To do so in this case is to say that, at any time before Langsdorf's action, it would have been merely natural for any ordinarily competent tie maker to think and act as Langsdorf later did. That is retrospective prophecy. It cannot prevail against developed facts.

After these ties, with bias-cut resilient lining, had been on the market some time and taken possession of their part of the field, and the patent had been sustained in this case in the court below, expert weavers worked out a method of making a fabric which, cut straight, has resiliency enough to do pretty well as a substitute for the bias-cut fabric to which some claims of the patent are restricted. The court below held this also to be infringement of some other claims. Both this question and any doubt whether, with my view of the importance of the resilient lining as such and the relative nonimportance of the loose stitching, the claims should have been treated somewhat differently than they were in that court, are questions as to which further discussion here is not worth while.