# 108    25 FEDERAL REPORTER, 2d SERIES

## FRANC–STROHMENGER & COWAN, Inc., v. ARTHUR SIEGMAN, Inc.

District Court, S. D. New York.    February 21, 1928.

**1. Patents ⟐118—Patent for improvement in neckties, disclosing material and texture to extent that skilled manufacturer could make tie, amply disclosed conception.**

Patent for improvement in neckties, disclosing material and texture to extent that skilled manufacturer would have no difficulty in making tie after reading patent, *held* to have amply disclosed conception and means constituting invention.

**2. Patents ⟐36(2)—Commercial success must be scrutinized with utmost caution before accepting fact as proof of invention.**

Commercial success must be scrutinized with utmost caution before accepting fact of success as proof of invention, since such success often results from causes other than meritorious invention.

**3. Patents ⟐62(3), 81—Defendant in patent infringement suit must prove defense of anticipation and prior use beyond reasonable doubt.**

Defendant in patent infringement suit holds the affirmative on issue of anticipation and prior use, and must prove his defense beyond all reasonable doubt.

**4. Patents ⟐62(2)—More than oral testimony fixing date of alleged anticipation and disclosing nature of construction is necessary, where possibility of mistake is apparent.**

In weighing testimony fixing date of alleged anticipation and disclosing nature of construction alleged to anticipate, something more than oral testimony, even from witnesses of highest character, is required, where possibility of mistake in recollection is apparent.

**5. Patents ⟐328—1,447,090, for improvements in neckties, held valid and infringed as to claims 1, 2, and 4, and invalid as to claim 3.**

Langsdorf patent, No. 1,447,090, for improvements in neckties, *held* valid and infringed as to claims 1, 2, and 4, and invalid as to claim 3.

In Equity. Patent infringement suit by Franc-Strohmenger & Cowan, Inc., against Arthur Siegman, Inc. Decree in accordance with opinion.

Clifford E. Dunn, of New York City (Frederick P. Fish, of Boston, Mass., and Charles Neave, of New York City, of counsel), for plaintiff.

Kenyon & Kenyon, of New York City (William Houston Kenyon, Douglas H. Kenyon, and O. Ellery Edwards, all of New York City, and Meier Steinbrink, of Brooklyn, N. Y., of counsel), for defendant.

THACHER, District Judge. This patent has already been litigated in the Sixth circuit, wherein the District Court Judge Westenhaver held claims 1, 2, 3, and 4, here in suit, valid and infringed. In the Circuit Court of Appeals, Judges Moorman and Donahue held the patent invalid for lack of invention; Judge Denison dissenting. Forchheimer v. Franc-Strohmenger & Cowan, 20 F.(2d) 553.

The invention relates to improvements in neckties, and more particularly to those of the four-in-hand type. After referring to difficulties encountered in constructing a tie which will withstand the strains of ordinary wear without distortion and breaking of the stitching which unites the fabric to the lining of the tie, Langsdorf describes the object of his invention as follows:

"One object of my invention is to overcome the difficulties and objections above mentioned, and to so construct a necktie of the four-in-hand type that the lining shall be sufficiently elastic or resilient in character and so stitched to the body material as not to cause breaking of the stitching or distortion of the tie, and at the same time so that the lining shall be capable of withstanding the pulling strain to which it may be subjected after having yielded lengthwise with the body material to a limited extent, and so that, when the pulling strain shall have been relieved, the body material and lining will assume their original shape and dimensions."

He then states that the invention consists in certain novel features of construction and combinations of parts, as described and claimed. In his detailed description and drawings he shows a four-in-hand tie having a lining stitched to the folds of the fabric with loose stitching. He then proceeds:

"The lining which I employ, and which may consist of the members 7 and 8 loosely stitched to the folds of the tie body material, is made of woven fabric cut on the bias so that it shall have limited elasticity or resiliency, and this constitutes a valuable feature of my invention. With the use of lining of woven material having limited elasticity, it will stretch with the stretching of the body material, and at the same time it will not be sufficiently more elastic than the elasticity of the body material as to cause breaking of the stitching, but said lining will suffice to relieve the body material from excessive stress or strain when the tie is subjected to great pulling force. It will be observed, also, that when the tie is stretched the loose stitching will slip, and this will assist in avoiding breaking of the thread.

"With my improvements, distorting of the tie will be prevented, as the stitching will not be broken or strained when the tie is pulled, and as the body material and also the lining will return to the normal positions as

soon as the pulling strain shall have been discontinued."

The claims in suit read as follows:

"1. A necktie, comprising a body portion including a knot-forming part and a woven fabric resilient lining connected thereto, said resilient lining extending into the knot-forming part of the tie.

"2. A necktie, comprising a body portion, and a woven fabric resilient lining connected therewith by loose stitching.

"3. A necktie provided with a lining attached thereto and consisting of woven fabric cut on the bias.

"4. A necktie comprising a body having folds, a woven fabric elastic or resilient lining in the tie body, and loose stitching uniting the folds of the tie body and connecting the woven fabric elastic or resilient lining thereto."

Infringement is clearly shown, and not seriously disputed.

[1] Langsdorf claims invention, not in the selection of the particular lining material to be used in the construction of a necktie, but in the conception that ties having resilient linings of sufficient strength to withstand the pulling strains of ordinary use, and sufficient bulk to give body to the tie, could be so constructed that the tie and its lining would yield to these strains and return to their normal positions without permanent distortion of the material or any breaking of the threads. The means which embody his conception are conceded to have been adequately disclosed, except in one respect. It is contended that the material and texture of the woven fabric bias-cut lining is crucial, and is not disclosed, and that therefore the patent is invalid for insufficient disclosure of the invention.

The lining disclosed is a resilient fabric cut on the bias, its resiliency being limited with relation to the material of which the tie is made. The patent shows that it must not stretch too easily, for then it will not take up the pulling strains to which the tie is subjected, and that it must not stretch much more, or impliedly much less, than the tie itself, for then the threads will break. Loose stitching is employed, so that slack will be left in the sewing, which can be taken up in the relative movements of the tie and its lining. Neckties are made of materials which vary greatly in resiliency. Recognizing this, Langsdorf did not attempt to instruct the art as to the exact degree of resiliency requisite in a lining, or that the woolen linings of his commercial product should be used. The selection of fabrics for neckties was left to the discretion of the individual manufacturer, and he was told to select his linings accordingly. This was sufficient if the knowledge of textiles possessed by men skilled in the art would enable them to select materials having the proper degree of resiliency relative to the particular body materials which they desired to use. The test of adequate disclosure is the understanding of such men, and it is by no means enough to condemn the patent disclosure to say that they may find it necessary to make several tests or trials before arriving at success. A. B. Dick Co. v. Barnett, 287 F. 573 (D. C. 2d); American Stainless Steel Co. v. Ludlum Steel Co., 290 F. 103 (C. C. A. 2d); Radio Corp'n of America v. E. J. Edmond & Co. (D. C.) 20 F.(2d) 929, 931. The specifications of the patent in suit are amply sufficient to lead a man skilled in the art with certainty to the desired result. There is found in this patent much more than "pregnant surmise," "promising hypotheses," "cues for experiment," and aimless shooting in the dark—held insufficient in Health Products Corp'n v. Ex-Lax Mfg. Co., 22 F.(2d) 286, 288 (C. C. A. 2d), H. Ward Leonard, Inc., v. Maxwell Motor Sales Corp'n, 252 F. 584, 590 (C. C. A. 2d), and Matheson v. Campbell, 78 F. 910 (C. C. A. 2d). A skilled manufacturer of men's neckwear would have no difficulty in making Langsdorf's tie after reading his patent, and the patent therefore amply discloses the conception and the means which constitute the invention.

It is next contended that the patent is void for lack of invention. Extraordinary commercial success has attended the sale of these patented ties from the beginning. Langsdorf's deliveries commenced in July, 1922. In 1921 his sales in cut-silk neckties were about $400,000; in 1922, $590,000, of which $390,000 represented sales made after his patented tie was put on the market; in 1923 his sales of cut-silk neckties increased to $890,000, all of the new construction; in 1924, to $1,400,000; in 1925, to $2,000,000; and in 1926, to $2,500,000. At no time has he been able to produce his patented tie in sufficient quantities to fill his orders. Even more impressive than these figures is the testimony of the trade. Leaders in the trade acknowledged with undisguised enthusiasm that the Langsdorf tie was better than anything they had ever seen before. It is an irresistible conclusion from this trade testimony that ties manufactured under the patent in suit possess qualities which were instantly recognized as of the greatest merit, and almost immediately revolutionized the

neckwear industry, solving difficulties of construction which manufacturers had been struggling with for years.

Nothing is more pertinent in this connection than what was said by Hough, J., in Kurtz v. Belle, 280 F. 277, 282 (C. C. A. 2d), in a case of striking similarity:

"If we viewed this hat lining, or any hat lining, in the light of our own experience, it would appear trivial and unworthy of the dignity of patent protection; but, looking at it through the evidence and (we hope) with the eyes of the hat lining trade, this patent represents a large and successful business. It is in the minds of all those who deal in hat linings of the utmost importance. No one ever made a lining of such simplicity, cheapness, and general adaptability as has Kurtz, and he has done it by mechanical means of winning simplicity, to all of which defendant has testified by deliberately imitating Kurtz's product and engaging in expensive litigation to defend the imitation. We are of opinion upon this record that Kurtz's hat lining is novel, useful, and displays patentable invention."

What was said by Judge Hough of the Kurtz hat lining is literally true of the Langsdorf tie, and his words in that case are the words of the trade in this.

[2] But commercial success so often results from causes other than meritorious invention that the causes of success must be scrutinized with the utmost caution before accepting the fact of success as proof of invention. Boston Pencil Co. v. Auto. Pencil Co., 276 F. 910 (C. C. A. 2d); Harvey Hubbell, Inc., v. General Electric Co., 267 F. 564 (C. C. A. 2d); De Mayo Coaling Co. v. Michener Stowage Co., 231 F. 736 (C. C. A. 2d); Locklin v. Buck, 159 F. 434 (C. C. A. 2d). This caution is obviously necessary in the arts relating to wearing apparel, where success in a nation-wide market often results from clever advertising, good business methods, and from changing fashions in clothes and in the materials from which clothes are made. Johnson v. Lambert, 234 F. 886 (C. C. A. 2d); Epstein v. Dryfoos (D. C.) 229 F. 756; Bonnie-B Co., Inc., v. Giguet (D. C.) 269 F. 275; Kleinert Rubber Co. v. Polkase Mfg. Co. (D. C.) 10 F.(2d) 399; Alfred Hale Rubber Co. v. Morse & Burt Co. (D. C.) 10 F.(2d) 843.

It was upon such considerations that decision turned in the Circuit Court of Appeals for the Sixth Circuit. The plaintiff's commercial success was attributed to the material known as "Resiline," which was used for linings in the plaintiff's commercial ties. Ascribing commercial success to the discovery and use of this material, the patent was declared void for lack of invention, Judge Denison dissenting. Forchheimer v. Franc-Strohmenger & Cowan, supra. From their opinions it is apparent that the judges divided upon questions of fact, and that the most important difference between them—decisive, I think, of the result—was as to whether the extraordinary commercial success of the plaintiff's commercial product was to be ascribed to the patent itself, or to the fortuitous discovery of a new lining material having extraordinary qualities, to which the novelty and commercial success of plaintiff's commercial neckties is to be attributed. The question is primarily one of fact, to be decided here upon the evidence which has been adduced.

From the present record it is entirely clear that, while the plaintiff was probably the first to use Resiline, cut on the bias, as a lining for a necktie, this material was by no means a newly discovered fabric, the discovery of which might explain the failure of others to achieve the success which the plaintiff achieved. An officer of the company which manufactured Resiline testified: "I do not know that it varied substantially from perhaps many fabrics that have been made long ago." When asked if there was anything novel in its manufacture he answered: "I should say 'No.'" This fabric was in fact copied from a sample already on the market. Furthermore, Langsdorf did not learn of the existence of Resiline until after filing his application, and after he had made and tested ties constructed in accordance with the instruction of his patent. Two of these original ties are in evidence. They do not materially differ from the plaintiff's commercial ties, and seem to possess all of the essential qualities possessed by ties having bias-cut Resiline linings. Their linings were cut from woven woolen fabrics which Langsdorf had in stock before he learned of the existence of Resiline.

Upon this state of the record I am unable to ascribe the plaintiff's commercial success to the discovery of Resiline. Similar materials had long been known and were readily available to those who wished to use them. Had the instruction of Langsdorf's patent been known, these materials, which were at hand, would certainly have been utilized, because they possessed that limited and relative resiliency which his patent disclosed as so desirable. The fact that such linings were not successfully used before demonstrated the novelty and value of his teaching, which

created new uses for old materials long available, and the success which followed is attributable, not to anything novel in the materials he used, but to his discovery that such materials could be used in the manner described in his patent.

The question remains whether his conception, and its embodiment in physical form, was original with him, and, if original, involved inventive thought or merely mechanical skill. The answer depends upon a comparison of what he did with what had been done before. The art was a highly competitive one, particularly so with regard to quality. Manufacturers of men's neckwear had for years been striving to improve their product and at the same time to reduce its cost. The prior art testimony is voluminous, but not impressive.

Judge Moorman, speaking for the majority in the Forchheimer Case, supra, said of the all-silk bias-cut ties of the prior art, made either with additional folds of the bias-cut body material in place of any lining or with separate linings of the same material, also cut on the bias:

"If the term 'woven fabric resilient lining' means something different from the body fabric itself, having distinct and useful qualities, these ties would clearly not anticipate Langsdorf; but if it means any woven resilient fabric inside the outer layer of the tie, there would, we think, be anticipation. Langsdorf does not say in terms, either in his claims or specifications, that he had in mind a lining fabric separate and different from that of the body of the tie, and yet the implication may be fairly said to be found in the detailed description of the specifications."

There is, I think, less ground for holding the Heath patent No. 335071 an anticipation of Langsdorf. Heath's tie was of rigid construction. He describes the lining which he employs as longitudinally elastic, but shows a fine linen canvas lining, cut straight. His purpose was to make his lining transversely unyielding and inelastic, so as to hold the facing material firmly and rigidly in place. He discloses no purpose in the very slight longitudinal elasticity of this transversely rigid lining which is to "firmly hold and retain the outer facing applied thereto in proper form." This, of course, is in direct contradiction of Langsdorf's teaching, and I find in it no disclosure of a tie lining resilient in the sense of the patent in suit.

Nor are the cotton and Canton flannel linings, cut straight or on the bias, and used in bias-cut silk ties of the prior art, resilient in the sense of the patent. The difficulty with such ties is that these linings have not that relative and limited degree of resiliency which Langsdorf first taught was essential in successful tie making. This is evident from inspection of the "Sulka" ties in evidence. In these ties the lining in the knot-forming portion of the tie is either rigidly sewn to the body material of the scarf or is rigidly sewn to the machine-stitched neckband and allowed to dangle without additional stitching into the knot-forming part of the tie. In each of these ties the lining is very much more elastic than the material of which the tie is made —so much so that it is quite obvious that such linings have little, if any, effect in relieving the body material from the pulling strains to which it is subjected in use. There is no such relation between the resiliency of the tie and of its lining as is described in the Langsdorf patent, and the two forms of construction, one rigid and the other dangling, disclose the conviction of the maker that no such relative resiliency is attainable. This loose dangling construction is also shown in the Eisenstadt tie, which is made of a grenadine material in imitation of a knitted tie, and which has a bias-cut cotton canvas lining. The tie has very little body indeed, and when subjected to any appreciable longitudinal strain is stringy. Furthermore, the identification of the tie as having been made in its present form in 1921 is sufficiently doubtful to require its rejection as proof of anticipation under the rule of reasonable doubt.

The Bloch "Sulka" tie, which the witness Bloch testified he purchased from Sulka's New York store in November, 1920, is a bias-cut silk four-in-hand tie having in the large end a bias-cut knitted silk lining which is rigidly sewn to the scarf. The character and construction of the tie is obviously different from Langsdorf's. The lining material stretches so much more easily than the tie itself that it can have little, if any, effect in relieving the silk from strain, and its texture is such as to be incapable of giving any real body to the tie, which, of course, is the primary purpose of any lining. The purchase of this necktie is but very weakly corroborated, and its effect is greatly weakened by the testimony of Sulka's salesman, who was entirely familiar with Sulka products, to the effect that, when he saw the Langsdorf tie, he had never seen anything like it before.

The defenses of prior use and anticipation, based upon evidence claimed to prove that early in 1920 S. S. Loeb & Co., in Boston, manufactured and sold bias-cut silk

four-in-hand ties with bias-cut woven haircloth linings which were resilient in the sense that they would stretch and return to normal condition, require careful analysis of the testimony. These defenses were not presented in the case in the Sixth circuit, a fact which in itself opens them to suspicion. Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 489, 20 S. Ct. 708, 44 L. Ed. 856. [3, 4] Upon the issue of anticipation and prior use the defendant holds the affirmative, and must prove his defense beyond all reasonable doubt. In the absence of contemporaneous records, verbal or structural, cases are rare indeed where oral testimony can be regarded as sufficient to remove probability of error in fixing the date of the alleged anticipation and in describing with precision the nature of the construction alleged to anticipate. In weighing such testimony the recollection of honest witnesses, endeavoring to remember transactions long out of mind, is regarded as peculiarly subject to the influence of suggestion inevitable in any attempt to aid the witness in recalling facts of which proof is eagerly sought. Something more than oral testimony, even from witnesses of the highest character, conscientiously endeavoring to tell the truth, is required where the possibility of mistake in recollection is apparent. Eibel Process Co. v. Minn. & Ont. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; The Barbed Wire Patent, 143 U. S. 275, 284, 12 S. Ct. 443, 450, 36 L. Ed. 154; Deering v. Winona Harvester Wks., 155 U. S. 286, 300, 15 S. Ct. 118, 39 L. Ed. 153; Block v. Nathan Anklet Support Co. (C. C. A.) 9 F.(2d) 311, 313.

S. S. Loeb was a neckwear manufacturer in Boston, Mass., operating under the name of S. S. Loeb & Co. In the summer of 1919 Loeb went to Europe. While in Paris he purchased at the stores of Seelio, Charvet, or Sulka certain ties, some of which he presented to his friends upon his return to Boston. One of these ties he gave to the forelady of his factory, a Mrs. Dalton, to have duplicated. He produced and identified a lining which he testified had been taken from this tie. This lining, he testified, was returned to him by the forelady and kept, with many other things which he preserved as specimens in his business. None of the ties brought from Paris were produced. Pinned to the lining is a label marked "Seelio," with the address of this firm in Paris; but Loeb was unable to state whether or not the tie was purchased from Seelio. The lining is identical with that in the Bloch "Sulka" tie, and the knitted silk piece designed to extend into the knot-forming portion of the tie is cut on the bias and is very elastic.

Anticipation is claimed for the ties made by Mrs. Dalton in attempting to duplicate the Parisian tie from which this lining is said to have been taken, and Loeb's testimony is that, after futile efforts to copy the lining of knitted silk material, the forelady constructed hand-sewn ties with bias-cut haircloth linings, which were resilient in the sense that when stretched longitudinally the lining and the covering silk would return to their normal condition. None of these ties have been produced. The witness testified that these neckties were at first given away as gifts, that early in 1920 a few were sold in Boston, to the Beckhart stores, to the Enterprise haberdashers, and to Kennedy & Co., and that the same neckties were sold under a special mail-order selling plan. The only contemporaneous records produced relate to ties sold pursuant to this plan. The scheme was to send ties by mail to prospective customers whose orders were solicited, a letter being sent at the same time advising that "the Silent Salesman of Highmount cravats is now upon its way to call upon you" (referring to the package sent by mail). In this circular two ties were referred to, "Shape 870 @ $7.50" and "Shape 562 @ $8.00 a dozen," the prospective buyer being informed that he would find in the pocket of the case four reasons why he should feature Highmount guaranteed cravats with the nonwrinkable interlining. Inclosed in the pocket of each case was a statement of these reasons. The first was that the new Highmount guaranteed cravat was made with nonwrinkable lining; the second, that "through the use of a resilient imported haircloth, a lining that cost $1.25 per yard, instead of flannel that cost 10¢ or 12¢ as used by most manufacturers, we have produced a tie that we guarantee will give your customers more wear and tie up better than any other they have had before"; the third, that the resilient interlining made a strong selling point, and that the customer, once he wore a tie made that way, would be a walking advertisement; and the fourth reason stated was a guaranty of satisfaction by the wearer and an offer to return his money should he be dissatisfied.

It is important to note that in this circular, and in the contemporaneous advertising, there was no mention of bias-cut linings or of resiliency, in the sense of capacity to stretch and return. Furthermore, Mrs. Dalton, Loeb's forelady, who was thoroughly familiar with the ties known as "870" and "562," although called as a witness for the

defendant, testified that 870 was a tie made by machine, with a straight-cut lining, and that No. 562 was of the same character. She was undoubtedly mistaken in her recollection that these ties were not made with haircloth. Lewis, who made the linings for Loeb, testified that the linings of these ties were always cut straight, were sometimes made of haircloth and sometimes of cotton, and were stitched the full length of the tie, with a tape. Loeb's shipping clerk, Shaw, whose duty it was to make up the cases which were sent out to prospective customers, and who was entirely familiar with the ties known as "870" and "562," testified that the reference in the circular to a nonwrinkable interlining was to a straight-cut haircloth lining; that these ties (870 and 562) had such linings, and were machine made, with a tape sewn along the seam of the silk, and that they were rigid and did not stretch. The circular produced as a contemporaneous record to show the sale of anticipating neckties is thus found to be in flat contradiction of the witness who produced it. Loeb is shown to have been threatened with suit for infringement, and has been using the plaintiff's construction for some time. He thus had a strong personal interest in the outcome of the suit.

Loeb's testimony was susceptible of corroboration or contradiction, not only by those engaged with him in the business of manufacturing and selling neckties, but also by those to whom he says he gave or sold these ties. Testimony in corroboration and in contradiction of Loeb is voluminous—too voluminous to be analyzed in detail here. Some of the considerations which have seemed pertinent in weighing this testimony may be stated.

There is no doubt that at some time prior to October, 1921, Loeb was using a straight-cut woven haircloth lining for which he justly claimed the merit of unwrinkableness. Nor is there any doubt that, shortly after his return from Europe, in November, 1919, all-silk ties of five or more folds were manufactured by him in small quantities. These all-silk ties, being cut on the bias, and the folds of the fabric being used in place of a lining, did have longitudinal resiliency, or capacity to stretch and return. Neither form of construction anticipates the patent in suit, but each goes far to explain the confusion which arises upon this record. There is much testimony to the effect that Loeb showed to his friends, shortly after his return from Europe, a tie which would stretch and return to its normal condition, and that some of these ties were sold to the stores he

named. Witnesses have testified that these ties stretched because they had bias-cut linings, and in some instances they have described the linings as made of a woven fabric similar to haircloth. None is able to produce any of the ties in question, or any records which disclose their construction.

Confusion in the minds of these witnesses may very well have arisen from the fact that they were shown, or purchased, all-silk ties which were resilient, and ties having straight-cut haircloth linings which were nonwrinkable. It has been shown, as pointed out, that Loeb himself fell into error because of this confusion and erroneously claimed that his styles 870 and 562 had bias-cut linings of haircloth, although it clearly appears that the linings were cut straight. The ease with which such confusion arises in the minds of witnesses is also shown by the fact that Mrs. Dalton was undoubtedly mistaken in testifying that the ties 870 and 562 did not have haircloth linings. Taking the testimony of those witnesses who had the best opportunity to observe and become familiar with the actual construction of Loeb's ties, I think the weight of the testimony is clearly to the effect that, while he did make and sell all-silk ties which were resilient, and ties with haircloth linings cut straight which were nonwrinkable, he did not make or sell, prior to the summer of 1922, any tie having a woven fabric lining cut on the bias. I am not unmindful of the fact that Mrs. Dalton's testimony and the testimony of one of the other women in the factory is to the contrary. Shaw, who was employed by Loeb as billing and shipping clerk from June, 1920, to February, 1924, and who, Mrs. Dalton said, was in a position to see practically all the ties that were shipped out, testified that he saw the ties Loeb brought back from Europe; that they were all-silk ties folded over many times and had no linings; that Loeb used no bias-cut linings in 1920 or 1921, but during this period used some straight-cut haircloth linings with tapes, and some five-fold silk ties with a short lining cut straight. Lewis, who was employed as a cutter by Loeb from August, 1921, until 1924, testified that when his employment commenced Loeb was using flannel and haircloth linings, which were always cut straight. He explained the method of cutting linings in diagonal blocks, so that the ends of the linings would have a diagonal cut. To an unobservant witness this form of construction might present the appearance of bias-cut material, although it was actually cut straight. Lewis further testified that Loeb purchased from Delano, in Boston, about

August, 1922, some ties having woven woolen linings cut on the bias.

Delano testified that these ties were sold to Loeb in June, 1922, and it is significant that, although Lewis testified that Loeb brought him a Delano tie containing a bias-cut woolen lining and asked him to experiment with it and get up a machine tie on that idea, Loeb, although recalled to the stand, did not deny this incident. The Delano tie was the plaintiff's form of construction, and if this construction was known to Loeb in 1920 it is quite inconceivable that he should have attempted in the summer of 1922 to copy the plaintiff's construction. The witness Hawes was an equal partner with Loeb in both the factory and a retail store which purchased 95 per cent. of its neckwear from S. S. Loeb & Co. This partnership relation continued up to March, 1922. Hawes testified that he knew nothing of any bias-cut lined tie prior to that date; that he recalls when Loeb came back from Europe in November, 1919, but that Loeb did not call his attention to any tie with a bias-cut lining, which he had brought back with him from Europe; furthermore, that neither Loeb nor the retail store which he managed ever sold or featured any ties with bias-cut linings while he was with them. These three witnesses had no conceivable interest in testifying favorably to the plaintiff. If they were interested at all, their interests lay with the defendant.

Many of the witnesses who attempted to corroborate Loeb were obviously interested in supporting the defense. As to all of these corroborating witnesses it is sufficient to adopt the comment made upon similar testimony in Deering v. Winona Harvester Works, 155 U. S. 286, 301, 15 S. Ct. 118, 123 (39 L. Ed. 153):

"Granting the witnesses to be of the highest character, and never so conscientious in their desire to tell only the truth, the possibility of their being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable, is such as to render oral testimony peculiarly untrustworthy; particularly so if the testimony be taken after the lapse of years from the time the alleged anticipating device was used. If there be added to this a personal bias, or an incentive to color the testimony in the interest of the party calling the witness, to say nothing of downright perjury, its value is, of course, still more seriously impaired."

Upon this record the possibility of error is abundantly shown. Indeed, the probabilities are all in favor of the plaintiff's version. Insufficiency of proof is more strikingly apparent than in the Barbed Wire Patent Case, 143 U. S. 275, 285, 12 S. Ct. 443, 450, 36 L. Ed. 154, and I am constrained to hold that Loeb did not anticipate Langsdorf's invention.

To my mind conviction is unavoidable that Judge Denison was right when he said in his dissenting opinion in the Forchheimer Case:

"It stands without dispute, as I understand the record, that no one had ever before put into a necktie a lining which did give body and strength and which, while permitting stretchability, confined that stretchability to the limits of resiliency, and was so constructed that the necktie as a whole would, not in vague theory but in daily practice, stretch a substantial distance, three or four inches, and then immediately, in all its length not held, return to its original length, and thus retake its original smoothness and form. According to the testimony and according to the sample exhibits, ties made according to the patent give satisfactory performance in these respects, while in others, older·or later, these qualities and capacities dwindle down to relative insignificance."

This was a contribution of extraordinary value to the art, and the merit of invention should not be denied because the construction disclosed embodies "mechanical means of winning simplicity." Kurtz v. Belle, 280 F. 277, 282 (C. C. A. 2d).

In concluding that the patent is valid, I am not unmindful of the great respect and deference which is due to the decision of the Circuit Court of Appeals for the Sixth Circuit. If doubt remained after careful consideration of the record, I should unhesitatingly follow that decision under well known rules of comity. These rules were stated in Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 S. Ct. 708, 44 L. Ed. 856, where, however, the court was careful to emphasize the primary judicial duty to dispose of cases according to the law and the facts, and in so doing to follow one's own convictions, if they be free from doubt, after giving to judgments of other courts whose decisions are not controlling, that respectful and deferential consideration which comity demands. In this case I am unable to escape the conviction that under the decisions in Kurtz v. Belle Hat Lining Co., 280 F. 277 (C. C. A. 2d), and Van Heusen v. Earl &

Wilson, 300 F. 922 (D. C. N. Y.), the patent in suit must be sustained. Judge Denison relied upon the correctness of these decisions in dissenting from the decision of his court in the Forchheimer Case, and considered them precisely in point. I am unable to distinguish them. They are authoritative in this court, and I am constrained to follow them.

[5] Question remains as to the validity of the individual claims. Judge Westenhaver held claims 1, 2, 3, and 4 valid. Judge Denison, in his dissenting opinion, expresses no opinion on the question as to whether the claims should have been treated somewhat differently than they were by Judge Westenhaver. Reading the claims in the light of the specifications, and giving to the words used the meaning which they have been given in the patentee's description of his invention, the term "resilient" must be understood in the sense of the specifications, not as including every material which is even to the slightest degree resilient, because all fabrics, whether bias-cut or straight-cut, are resilient in this sense. The term obviously means that limited and relative resiliency which is described and disclosed in the specifications. So construed, I think there can be no doubt as to the validity of claims 1, 2, and 4, all of which speak of a woven fabric resilient lining. Claim 3 is not thus limited. It reads: "A necktie provided with a lining attached thereto and consisting of woven fabric cut on the bias." This claim seems to me too broad to be sustained by the disclosure.

Result is that claims 1, 2, and 4 are held valid and infringed; claim 3, invalid.

Enter decree accordingly.